Highlights Healthcare, LLC v. Abell, 2026 NCBC 67.

STATE OF NORTH CAROLINA

IREDELL COUNTY

HIGHLIGHTS HEALTHCARE, LLC,
EMPYREAN HOSPICE, LLC, and
HLRE, LLC,

Plaintiffs/Counterclaim
Defendants

v.

DOUGLAS J. ABELL, JAMES
MAGEE, SEAN J. O'REILLY,
MICHAEL STANLEY, and CHER
ABELL,

Defendants,

DOUGLAS J. ABELL, JR. and
JAMES MAGEE,

Counterclaim Plaintiffs,

DOUGLAS J. ABELL, JR., JAMES
MAGEE, HIGHLIGHTS
HEALTHCARE, LLC, and
EMPYREAN HOSPICE, LLC,

Third-Party Plaintiffs,

v.

LARRY GRAHAM and KNOX HILL
INVESTMENTS, LLC,

Third-Party Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CVS001765-480

ORDER AND OPINION ON
MOTIONS TO DISMISS

**THIS MATTER** is before the Court on Defendants Douglas J. Abell, James Magee, Sean J. O'Reilly, Michael Stanley, and Cher Abell's (collectively, "Defendants") Partial Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 16); Plaintiffs Highlights Healthcare, LLC, Empyrean Hospice, LLC, and HLRE, LLC's (collectively, the "Companies") Partial Motion to Dismiss Defendants'

Counterclaims (ECF No. 46); and Third-Party Defendants Larry Graham and Knox Hill Investments, LLC's (together, "Third-Party Defendants") Partial Motion to Dismiss Third-Party Complaint (ECF No. 60) (collectively, "Motions to Dismiss" or the "Motions").[1]

Having considered the Motions, the parties' briefs, the arguments of counsel, the applicable law, and all other appropriate matters of record, the Court concludes that the Motions to Dismiss should each be **GRANTED in part** and **DENIED in part** for the reasons set forth below.

> *Villmer Caudill, PLLC, by Bo Caudill, Precious McLaughlin, Brittney Slade, and Nicholas Williams, for Plaintiffs Highlights Healthcare, LLC, Empyrean Hospice, LLC, and HLRE, LLC.*
>
> *Spilman Thomas & Battle, PLLC, by Emily Merritt, Jeffrey Patton, and James Simon, for Defendants Douglas J. Abell, Jr., James Magee, Sean J. O'Reilly, Michael Stanley, and Cher Abell.*
>
> *TLG Law, by Sean McLeod and David Redding, for Third-Party Defendants Larry Graham and Knox Hill Investments, LLC.*

Davis, Judge.

## INTRODUCTION

1.      This case involves a series of disputes between the members, former officers, and managers of three affiliated limited liability companies.  In connection with the present Motions to Dismiss, the Court must evaluate a somewhat complex maze of interconnected arguments asserted by the various parties.

---

[1] As is discussed in greater detail below, although captioned as a "partial" motion to dismiss, the Court notes that the Third-Party Defendants' Motion to Dismiss actually requests that each of the claims contained in the Third-Party Complaint be dismissed in their entirety.

**FACTUAL AND PROCEDURAL BACKGROUND**

2.     The Court does not make findings of fact in connection with a motion to dismiss under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure and instead recites those facts contained in the operative pleading (and in documents attached to, referred to, or incorporated by reference in the operative pleading) that are relevant to the Court's determination of the motion.  *See, e.g., Window World of Baton Rouge, LLC v. Window World, Inc.*, 2017 NCBC LEXIS 60, at \*11 (N.C. Super. Ct. July 12, 2017).

3.     As this matter is before the Court on multiple motions to dismiss under Rule 12(b)(6), the Court summarizes the factual allegations from each of the operative pleadings for context, but, in resolving each of the Motions, the Court limits its review to the allegations contained in the specific pleading that is the subject of the Motion.

**I.     The Parties**

4.     Plaintiff/Counterclaim Defendant Highlights Healthcare, LLC ("Highlights") is a Delaware limited liability company that maintains its principal place of business in Mooresville, North Carolina.  (Amended Complaint, ECF No. 6, ¶ 3; Third-Party Complaint, ECF No. 22, ¶ 62.)  Highlights is primarily in the business of providing early intervention, diagnostic, and applied behavior analysis ("ABA") therapy services for children with autism spectrum disorder.  (Am. Compl. ¶ 3; Counterclaims, ECF No. 18, ¶ 7; Third-Party Compl. ¶ 3.)

5.     Plaintiff/Counterclaim Defendant Empyrean Hospice, LLC ("Empyrean") is a Delaware limited liability company that maintains its principal

place of business in Mooresville, North Carolina. (Am. Compl. ¶ 3; Third-Party Compl. ¶ 62.) Empyrean is primarily in the business of providing hospice services consisting of palliative care to individuals with terminal illnesses. (Am. Compl. ¶ 3; Countercls. ¶ 11; Third-Party Compl. ¶ 8.)

6. Plaintiff/Counterclaim Defendant HLRE, LLC ("HLRE") is a North Carolina limited liability company that maintains its principal place of business in Mooresville, North Carolina. (Am. Compl. ¶ 3; Countercls. ¶ 10; Third-Party Compl. ¶ 6.) HLRE is a holding company and was formed for the purpose of facilitating real estate transactions involving Highlights and Empyrean. (Am. Compl. ¶ 3; Countercls. ¶ 10; Third-Party Compl. ¶ 6.)

7. Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Douglas J. Abell, Jr. is a citizen of the State of Florida.[2] (Am. Compl. ¶ 5; Third-Party Compl. ¶ 4.) Abell has previously served as the general counsel and the chief executive officer ("CEO") for each of the Companies. (Am. Compl. ¶¶ 21–22; Countercls. ¶ 2; Third-Party Compl. ¶¶ 11, 27.)

8. Defendant/Counterclaim Plaintiff/Third-Party Plaintiff James Magee is a citizen of the State of North Carolina. (Am. Compl. ¶ 7; Third-Party Compl. ¶ 5.) Magee has previously served as the CEO for Highlights and HLRE. (Am. Compl. ¶ 21; Countercls. ¶ 3; *see also* Third-Party Compl. ¶ 3.)

---

[2] As discussed below, Douglas Abell's wife—Cher Abell—has also been named as a defendant in this case. For the avoidance of confusion, throughout this opinion the Court will refer to Douglas Abell as "Abell" and his wife as "Cher Abell."

9. Third-Party Defendant Knox Hill Investments, LLC ("Knox Hill") is a Delaware limited liability company and is currently the majority interest owner in Highlights. (Am. Compl. ¶ 12; Countercls. ¶ 1; Third-Party Compl. ¶¶ 6–7.)

10. Third-Party Defendant Larry Graham is a citizen of the State of North Carolina. (Third-Party Compl. ¶ 6.) Graham currently holds a majority ownership interest in both HLRE and Knox Hill. (Am. Compl. ¶¶ 15–16, 49; Countercls. ¶¶ 1, 4, 10; Third-Party Compl. ¶ 6; *see also* Am. Compl. Ex. D, at 74.)

11. Defendant Sean J. O'Reilly is a citizen of the Commonwealth of Kentucky. (Am. Compl. ¶ 8.)

12. Defendant Michael Stanley is a citizen of the State of Illinois. (Am. Compl. ¶ 9.)

13. Defendant Cher Abell is a citizen of the State of Florida and is married to Abell. (Am. Compl. ¶ 6.)

## II. The Companies' Allegations

14. In their Amended Complaint, the Companies have alleged that Highlights was formed on 30 October 2019 by Abell and Magee, who remained its sole owners until April 2021 when Graham—through Knox Hill—began investing in the company. (Am. Compl. ¶ 12.)

15. On 1 January 2022, Abell, Magee, and Graham (on behalf of Knox Hill) executed an operating agreement for Highlights, reflecting that 700 "Class A Units" of ownership in the company were to be held as follows: Knox Hill owning 525 units; Magee owning 75 units; Abell owning 50 units; and a non-party, Jessica Kleberg,

owning 50 units. (Am. Compl. ¶ 13; *see also* Am. Compl. Ex. A ("Highlights's Operating Agreement"), at 74.)

16. At the same time, Abell and Magee each entered into separate, but identical, restrictive covenant agreements (together, the "Restrictive Covenants") with Highlights, which contained, *inter alia*, the following confidentiality, non-competition, and non-solicitation provisions:

2. <u>Confidentiality.</u>

2.1 The Investor agrees that all Confidential Information which the Investor creates or to which the Investor has access as a Unitholder and other associations with the LLC or any of its Affiliates is and will remain the sole and exclusive property of the LLC and its Affiliates. The Investor agrees that, except as required for the proper performance of the Investor's regular duties for the LLC and its Affiliates, as expressly authorized in writing in advance by a duly authorized officer of the LLC, or as required by applicable law, the Investor will never, directly or indirectly, use or disclose any Confidential Information. The Investor understands and agrees that this restriction will continue to apply after Investor ceases to be a Unitholder for any reason. For the avoidance of doubt, nothing in this Agreement limits, restricts or in any other way affects the Investor's communicating with any governmental agency or entity, or communicating with any official or staff person of a governmental agency or entity, concerning matters relevant to the governmental agency or entity. The Investor will not be held criminally or civilly liable under any federal or state trade secret law for disclosing a trade secret (a) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney, solely for the purpose of reporting or investigating a suspected violation of law, or (b) in a complaint or other document filed under seal in a lawsuit or other proceeding. Notwithstanding this immunity from liability, the Investor may be held liable if the Investor unlawfully accesses trade secrets by unauthorized means.

2.2 The Investor agrees that all documents, records and files, in any media of whatever kind and description, relating to the business, present or otherwise, of the LLC or any of its Affiliates, and any copies, in whole or in part, thereof (the "LLC Documents"), whether or not prepared by the Investor, will be the sole and exclusive property of the

LLC and its Affiliates. The Investor agrees to safeguard all LLC Documents and to surrender to the LLC or its relevant Affiliate, at the time the Investor ceases to be a Unitholder or at such earlier time or times as an authorized officer of the LLC may specify, all LLC Documents then in the Investor's possession or control. The Investor also agrees to disclose to the LLC, at the time the Investor ceases to be a Unitholder or at such earlier time or times as an authorized officer of the LLC may specify, all passwords necessary or desirable to obtain access to, or that would assist in obtaining access to, any information which the Investor has password-protected on any computer equipment, network or system of the LLC or any of its Affiliates.

. . .

4.    Restricted Activities.

    4.1.    Other than Investor's current employment, while the Investor or an Immediate Family Member of the Investor is a Unitholder of the LLC or an Affiliate and during the twelve (12)-month period immediately following the date the Investor ceases to be a Unitholder (the "Non-Compete Period"), the Investor agrees to not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engage in the business of ABA Therapy ("the Business") in any geographic area in which the LLC or any of its Affiliates engage in the Business or are actively planning to engage in the Business during the period Investor is a Unitholder or, with respect to the portion of the Non-Compete Period that follows the date the Investor ceases to be a Unitholder, at the time of such cessation (the "Restricted Area"), or undertake any planning to do any of the foregoing anywhere in the Restricted Area. Specifically, but without limiting the foregoing, the Investor agrees not to work or provide services, in any capacity, anywhere in the Restricted Area, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person that is engaged in the Business; provided that notwithstanding the foregoing, that for purposes of this Agreement, the Investor may engage in (i) owning, directly or indirectly, solely as an investment, up to five percent (5%) of any class of securities of any LLC (whether public or private) that is competitive or substantially similar to the Business; (ii) owning a passive equity interest in a private debt or equity investment fund in which the Investor does not have the ability to control or exercise any managerial influence over such fund; or (iii) any activity consented to in advance in writing by the LLC.

4.2.    While the Investor or an Immediate Family Member of the Investor is a Unitholder of the LLC and its Affiliates [*sic*] and during the twelve (12)-month period immediately following the date the Investor ceases to be a Unitholder (the "Non-Solicit Period", and together with the Non-Compete Period, the "Restricted Period"), the Investor agrees to not, directly or indirectly, (a) solicit or encourage any customer, vendor, supplier or other business partner of the LLC or any of its Affiliates to terminate or diminish its relationship with any of them; or (b) seek to persuade any customer, such vendor, supplier or other business partner, or any prospective customer, vendor, supplier or other business partner of the LLC or any of its Affiliates, to conduct with anyone else any business or activity which such customer, vendor, supplier or other business partner conducts, or such prospective customer, vendor, supplier or other business partner could conduct, with the LLC or any of its Affiliates; provided, that these restrictions will apply only with respect to those Persons who are or have been a business partner of the LLC or any of its Affiliates at any time within the six (6)-month period immediately preceding the activity restricted by this Section 4.2 or whose business has been solicited on behalf of the LLC or any of the Affiliates by any of their officers, employees or agents within such six (6)-month period, other than by form letter, blanket mailing or published advertisement.

4.3.    During the Non-Solicit Period, the Investor agrees to not, and to not assist any other Person to, directly or indirectly, (a) hire or engage, or solicit for hiring or engagement, any employee of the LLC or any of its Affiliates or seek to persuade any such employee to discontinue employment or (b) solicit or encourage any independent contractor providing services to the LLC or any of its Affiliates to terminate or diminish its relationship with any of them.   For purposes of this Agreement, (i) an "employee" or an "independent contractor" of the LLC or any of its Affiliates is any Person who was such at any time within the twelve (12)-month period immediately preceding the activity restricted by this Section 4.3 and (ii) an "independent contractor" means only a natural person independent contractor or an entity independent contractor controlled by a natural person providing services to the LLC or any of its affiliates.   Notwithstanding the foregoing, for purposes of this Agreement, the placement of general advertisements that may be targeted to a particular geographic or technical area but that are not specifically targeted toward employees or independent contractors of the LLC shall not be considered solicitation.

(Am. Compl. ¶ 14; *see also* Am. Compl. Ex. B, at 1–4; Am. Compl. Ex. C, at 1–4.)

17.     Subsequently, Abell, Magee, and Graham formed HLRE on 17 August 2022 and executed its operating agreement shortly thereafter, on 1 September 2022. (Am. Compl. ¶¶ 15–16; *see also* Am. Compl. Ex. D ("HLRE's Operating Agreement").) According to HLRE's Operating Agreement, the ownership of the company was divided as follows: Graham with an 80% interest; Magee with a 10% interest; and Abell with a 10% interest. (Am. Compl. Ex. D, at 74.)

18.     Upon the formation of Highlights and HLRE, Magee served as their CEO, while Abell served as their general counsel. (Am. Compl. ¶ 21.)

19.     Abell and Graham organized Empyrean on 27 April 2023. (Am. Compl. ¶ 17.) Shortly thereafter, on 1 May 2023, Abell—acting as Empyrean's president—executed its operating agreement. (Am. Compl. ¶¶ 17–18; *see also* Am. Compl. Ex. E ("Empyrean's Operating Agreement").)

20.     According to the Amended Complaint, at the time Empyrean was organized, Graham—through his sole ownership of various pass-through entities—was its sole owner.[3] (Am. Compl. ¶ 18.)

21.     Though they are distinct legal entities, the Amended Complaint alleges that each of the Companies worked as integrated affiliates of each other and shared common control, strategic direction, executive oversight, business infrastructure, technology platforms, employee data, and confidential information. (Am. Compl. ¶¶ 4, 19–20.)

---

[3] Though the Amended Complaint is unclear on this issue, it appears that at some point between 1 May 2023 and 5 December 2024, Abell obtained a 10% ownership interest in Empyrean. (*See* Am. Compl. Ex. G, at 2.)

22. In November 2023, Highlights and HLRE informed Abell that he would be replacing Magee and assuming the role of CEO—in addition to continuing to serve in his role as the Companies' general counsel. (Am. Compl. ¶¶ 5, 7, 22–23.)

23. Shortly after assuming his position as CEO, the Amended Complaint alleges that Abell began working with Magee, O'Reilly, and Stanley to solicit private equity investment firms to invest in the Companies. (Am. Compl. ¶¶ 44–47.) Furthermore, throughout April and May 2024, Abell, Magee, O'Reilly, and Stanley used the Companies' confidential information to prepare multiple presentations to entice private equity investors. (Am. Compl. ¶¶ 45–48.)

24. However, in May 2024, Graham—on behalf of Knox Hill—expressed his concerns about Abell's actions and advised Abell that he did not agree with Abell's plan to obtain private equity investors for the Companies. (Am. Compl. ¶¶ 49–51.)

25. Nonetheless, Abell, Magee, O'Reilly, and Stanley continued using the Companies' confidential information in presentations with potential private equity investors through September 2024. (Am. Compl. ¶¶ 51–53, 55–56.)

26. In September 2024, after having met with various potential equity investment firms, Abell informed Graham that a firm called Shore Capital was interested in investing in the Companies. (Am. Compl. ¶¶ 55–57.) However, once again, Graham informed Abell that he was not interested in partnering with a private equity investment firm due to his concern that it would "change the mission" of the Companies. (Am. Compl. ¶ 57.)

27. The Amended Complaint alleges that Abell, Magee, O'Reilly, and Stanley subsequently informed Shore Capital that they would continue to work toward a deal while they formed their own competing business. (Am. Compl. ¶¶ 58–61.)

28. In furtherance of their scheme to start a competing business, the Amended Complaint alleges that, on 14 September 2024, Abell reserved the company name "Lamplight Hospice Services LLC" with the State of Delaware. (Am. Compl. ¶ 54; *see also* Am. Compl. Ex. S.)

29. Shortly thereafter, on 7 October 2024, O'Reilly sent an email to Abell and Stanley, which stated, in relevant part, as follows:

1. We expect key personnel to want to leave [E]mpyrean and join this effort[.]

2. We recognize and value [Graham's] expertise, but have a ton of conviction about moving ahead without him--see [Abell's] Empyrean experience and growth[.]

3. Moving ahead without [Graham] may simplify things without impacting our ability to tap into contacts in key markets/with sellers to grow this thing[.]

4. We remain excited and ready to move ahead[.]

(Am. Compl. ¶ 60; *see also* Am. Compl. Ex. W, at 1.)

30. During this time, Abell and Magee began developing business concepts, marketing materials, service models, and other key documents relating to ABA therapy and hospice operations. (Am. Compl. ¶ 64.) Abell also began emailing the Companies' financial documents, corporate models, and other key materials to his personal email address. (Am. Compl. ¶ 68.)

31. In November 2024—allegedly due to Abell's poor job performance and his failure to complete the various tasks that were being assigned to him—Abell agreed to resign his position as CEO and to continue serving as the Companies' general counsel. (Am. Compl. ¶¶ 23, 66.)

32. Shortly thereafter, in December 2024, Abell, Magee, and Graham began having discussions about Graham purchasing Abell and Magee's respective ownership interests in the Companies. (Am. Compl. ¶ 25.) As a result of these conversations, Abell—acting in his capacity as the Companies' general counsel—drafted Unit Repurchase Agreements pursuant to which Graham would purchase Abell's ownership interests in the Companies for $2,623,000 and Magee's ownership interests in Highlights and HLRE for $810,000. (Am. Compl. ¶¶ 26–27; *see also* Am. Compl. Ex. F–G.)

33. The Amended Complaint alleges that—through various email exchanges—Abell and Magee each indicated their agreement to the terms of the Unit Repurchase Agreements, with the intent that the transaction would close on 31 December 2024. (Am. Compl. ¶ 27; *see also* Am. Compl. Ex. G–H.)

34. Following these discussions, Magee resigned from his employment with the Companies on 11 December 2024. (Am. Compl. ¶ 29.)

35. Shortly thereafter, on 15 January 2025, each of the Companies terminated Abell's employment. (Am. Compl. ¶ 31.)

36. Following Abell's termination, the Companies requested—via email—that Abell return all property belonging to the Companies in his possession,

specifically including his work laptop. (Am. Compl. ¶ 82; *see also* Am. Compl. Ex. AB.)

37. Less than a week later, on 20 January 2025, the Companies discovered that Abell was still using his work laptop and had been able to connect to the Companies' network through an "operations" account. (Am. Compl. ¶¶ 84–85.) Upon learning of Abell's access to their system, the Companies had the screen visibility and keyboard and mouse control for Abell's laptop disabled and each of his user accounts removed. (Am. Compl. ¶ 84.)

38. Though his access to the Companies' accounts had been disabled, on 8 February 2025, Abell's Empyrean-associated email address received a meeting invitation from the Companies' former accounting firm—Blue Co. ("Blue"). (Am. Compl. ¶ 88; *see also* Am. Compl. Ex. AF.)

39. In the body of the meeting invitation, Blue stated, in relevant part, "Attached is a single hospice agency financial model that is based on actual experience (rows 1-140) with a corporate support center expense overlay (rows 142-157)." (Am. Compl. ¶ 91; *see also* Am. Compl. Ex. AE.) Attached to the meeting invitation were two documents: (1) a PowerPoint presentation titled "Hospice Overview.ppt" and (2) an Excel spreadsheet titled "Copy of Lamplight Hospice 2025 Model.xlsx" (the "Lamplight Model"). (Am. Compl. ¶ 90; *see also* Am. Compl. Ex. AF–AG.)

40. Upon review, the Companies determined that the Lamplight Model that Blue had attached to the meeting invitation was substantively identical to a

document that the Companies had provided to Abell that was titled "One Branch 30.60.90.120 NIFO through Sep.xlsx" (the "NIFO Model"). (Am. Compl. ¶¶ 92–94; *see also* Am. Compl. Ex. AH.)

41. In essence, the NIFO Model was the financial model that Empyrean had used to plan the initial operation of its Aiken, South Carolina, facility and included detailed information regarding the facility's actual and projected costs, income, and profits. (Am. Compl. ¶¶ 92–94; *see also* Am. Compl. Ex. AH.)

42. Though the Companies had never provided—or authorized Abell to provide—Blue with a copy of its NIFO Model, its format, general ledger descriptions, general ledger numbers, and financial numbers were identical to those reflected in the Lamplight Model attached to Blue's meeting invitation. (Am. Compl. ¶¶ 94–95.)

43. The Amended Complaint alleges that on 9 April 2025 Magee contacted the Companies' primary office supplies vendor—Staples—and requested that details regarding the Companies' business with Staples be sent to his personal email address. (Am. Compl. ¶¶ 79–80.)

44. Shortly thereafter, on 30 April 2025, an individual named Alexis Rand contacted two of Highlights's employees and stated that she was "working with [or for] [Abell], regarding a new venture" and that they "ha[d] . . . contracts with ABA companies." (Am. Compl. ¶ 71.) Believing that Rand's message was an indirect attempt by Abell to solicit them to leave Highlights and join a new competing business, the two employees immediately reported their receipt of the message to the Companies. (Am. Compl. ¶ 72.)

45.    Upon investigation, the Companies learned that Rand was employed as the chief clinical officer for a Georgia company named "Lamplight Behavior Analysis."[4]  (Am. Compl. ¶¶ 71–74.)

46.    The Companies also discovered that at least one employee—Cavan Doherty—had already resigned from his employment with Highlights to accept a position at Lamplight Behavior Analysis.  (Am. Compl. ¶ 76.)

47.    The Amended Complaint alleges that Abell has engaged in various additional activities designed to solicit the Companies' employees, including repeatedly sending requests on social media to one of the Companies' key employees. (Am. Compl. ¶ 77.)

48.    After conducting a review of Abell's alleged misconduct, the Companies discovered several instances in which Abell had used his position to draft and execute various promissory notes on behalf of Highlights, including:

(a)    a promissory note in the amount of $400,000 payable to Larry Graham, dated 25 May 2023;

(b)    a promissory note in the amount of $600,000 payable to Larry Graham, dated 26 July 2023;

(c)    a promissory note in the amount of $400,000 payable to Abell, dated 1 August 2023;

---

[4] The Amended Complaint alleges that Lamplight Behavior Analysis was formed on 6 February 2025 by James Crawford, a friend and former business partner of Magee. (Am. Compl. ¶ 74.)  At the time the Amended Complaint was filed, the Companies alleged that Lamplight Behavior Analysis was scheduled to open its first location in June 2025—less than twenty miles from one of the Companies' facilities.  (Am. Compl. ¶ 75.)

(d)    a promissory note in the amount of $121,000 payable to Abell, dated 23 October 2023; and

(e)    a promissory note in the amount of $2,392,791.84 payable to Abell and Cher Abell, dated 1 July 2024.

(Am. Compl. ¶¶ 97–100; *see also* Am. Compl. Ex. AI–AJ.)

49. These promissory notes, the Companies allege, were made without authorization and executed without Graham's knowledge or consent. (Am. Compl. ¶¶ 97–98.)

## III. Abell and Magee's Allegations

50. Through their Counterclaims and Third-Party Complaint, Abell and Magee have painted a very different picture of the internal operations of the Companies and the circumstances surrounding their respective departures. (*See generally* Countercls. ¶¶ 1–4; Third-Party Compl. ¶¶ 1–3.)

51. According to the Counterclaims and Third-Party Complaint, Abell and Graham first became acquainted in March 2011, when Graham hired Abell to serve as the general counsel for a hospice company Graham had founded, Curo Health Services ("Curo"). (Countercls. ¶ 1; Third-Party Compl. ¶ 1.)

52. While still working at Curo, Abell and Graham began collaborating with Magee to form Highlights. (Countercls. ¶ 7; Third-Party Compl. ¶ 3.)

53. According to Abell and Magee, Highlights was formed under Delaware law on 19 October 2019, and Graham (through Knox Hill) has always held a

substantial ownership interest in the company. (Countercls. ¶¶ 7–9; Third-Party Compl. ¶¶ 3–5.)

54.     Thereafter, Abell, Magee, and Graham worked together to form HLRE under North Carolina law on 18 August 2022, with Abell and Magee each holding a 10% ownership interest and Graham holding an 80% ownership interest. (Countercls. ¶ 10; Third-Party Compl. ¶ 6.)

55.     Then, in April 2023, after selling their respective interests in—and terminating their employment with—Curo, Abell and Graham established Empyrean under Delaware law. (Countercls. ¶¶ 6, 11; Third-Party Compl. ¶¶ 2, 7.) The Counterclaims and Third-Party Complaint allege that—at all relevant times—Abell has held a 10% ownership interest in Empyrean, while Graham, individually, has held the remaining 90% ownership interest. (Countercls. ¶ 11; Third-Party Compl. ¶ 7.)

56.     As a Medicare-eligible hospice services provider, Empyrean was required to offer a spiritual care program to its patients. (Countercls. ¶ 12; Third-Party Compl. ¶ 8.) Together, Graham and Abell decided that Empyrean would operate as a "faith-driven company offering salvation in Christianity on a permission-based, voluntary basis[.]" (Countercls. ¶ 12; Third-Party Compl. ¶ 8.)

57.     Despite their respective ownership interests in each of the Companies, Abell and Magee allege that Graham has acted on a *de facto* basis as the Companies' sole manager by making key decisions without obtaining proper approval from the

Companies' officers or board of managers. (Countercls. ¶¶ 4, 20; Third-Party Compl. ¶¶ 7, 16.)

58. Abell and Magee contend that after unilaterally appointing Abell as the CEO of each of the Companies in November 2023, Graham was made fully aware—and approved—of Abell's efforts to solicit private equity investments in the Companies. (Countercls. ¶¶ 15, 21–22; Third-Party Compl. ¶¶ 11, 17–18.)

59. Despite Abell and Magee's expectation that their respective investments in each of the Companies would be repaid once the Companies were sold to private equity investors, Graham began expressing his "concern" that private equity investors would change the Companies' religious mission. (Countercls. ¶¶ 23, 45; Third-Party Compl. ¶¶ 19, 41.)

60. Beginning in the summer of 2023, and continuing through 2024, Graham became increasingly fervent in his religious beliefs, resulting in his making erratic and inappropriate management decisions. (Countercls. ¶¶ 13–19; Third-Party Compl. ¶¶ 9–15.)

61. For example, Graham: (1) designed and implemented a "Culture Test" to determine if the Companies' employees were "living a Christian lifestyle"; (2) began threatening to terminate Highlights's and Empyrean's employees who did not participate in weekly "prayer call" events; (3) demanded that key executives and employees attend services at his church; and (4) diverted monthly payments of $36,000 from Highlights and Empyrean to his church. (Countercls. ¶¶ 13–14, 24–25, 30; Third-Party Compl. ¶¶ 9–10, 20–21, 26.)

62. Abell and Magee further allege that—in addition to causing multiple executives and employees to resign due to harassment—Graham attempted to take adverse employment actions against two of Highlights's and Empyrean's employees based solely upon his perception of their religious beliefs and sexual orientations. (Countercls. ¶¶ 14, 16, 18, 26, 29–30; Third-Party Compl. ¶¶ 10, 12, 14, 22, 25–26.)

63. At the same time, Graham began using Highlights's and Empyrean's funds to make numerous non-business expenditures, including: (1) leasing an apartment in downtown Charlotte, North Carolina, for his personal use; (2) leasing a jet for his personal use; (3) making various payments to his wife; and (4) paying for personal meals, vacations, vehicles, home repairs, remodeling, and his personal mortgage. (Countercls. ¶ 19; Third-Party Compl. ¶ 15.)

64. On 11 November 2024—less than a month after Abell refused to attend one of Graham's church services—Graham made the unilateral decision to remove Abell from his position as CEO of the Companies. (Countercls. ¶¶ 27, 31; Third-Party Compl. ¶¶ 23, 27.)

65. Shortly thereafter, on 5 December 2024, Abell and Magee were informed by the Companies' chief financial officer—Melissa Coleman—that Graham had made the decision to acquire Abell and Magee's respective ownership interests in each of the Companies and that their equity interests had already been converted to debt in the Companies' financial records. (Countercls. ¶ 32; Third-Party Compl. ¶ 28.)

66. After receiving Coleman's email, Abell and Graham discussed the matter and were able to reach an agreement in principle, whereby Abell's principal

investment would be repaid through ten quarterly installments. (Countercls. ¶ 34; Third-Party Compl. ¶ 30.) However, Abell and Graham were not able to reach an agreement as to the remaining material terms of the purported buyout agreement. (Countercls. ¶¶ 34–35; Third-Party Compl. ¶¶ 30–31.)

67. With respect to Magee, after Magee had received Coleman's email, Graham approached Magee's cubicle, began engaging in physically and verbally intimidating conduct, and refused to leave until Magee "agreed" to sell his ownership interests in the Companies to Graham. (Countercls. ¶ 33; Third-Party Compl. ¶ 29.)

68. Almost a week after this encounter, on 11 December 2024, Magee approached Graham to express his concern about the Companies' management, the equity purchase plan, and Graham's behavior. (Countercls. ¶ 36; Third-Party Compl. ¶ 32.) In response to Magee's concerns, Graham immediately terminated Magee and contacted Abell to falsely inform him that Magee had resigned. (Countercls. ¶ 36; Third-Party Compl. ¶ 32.)

69. Throughout the remainder of December 2024, and into early January 2025, Abell exchanged various emails with Coleman concerning the terms of the purported buyout agreement, and the two of them exchanged various drafts. (Countercls. ¶¶ 37–40; Third-Party Compl. ¶¶ 33–36.)

70. However, rather than negotiating with Abell in good faith, on 15 January 2025, Graham terminated Abell's employment solely for the purpose of declaring a "triggering event" under the terms of the Companies' respective operating agreements. (Countercls. ¶¶ 41–42; Third-Party Compl. ¶¶ 37–38.)

71.    Having declared such a "triggering event," Abell and Magee contend that Graham has attempted to usurp their respective ownership interests in each of the Companies without their consent and without providing them with fair compensation.  (Countercls. ¶¶ 42–44; Third-Party Compl. ¶¶ 38–40.)

IV.    **Procedural History**

72.    The Companies initiated this action by filing a Complaint in Iredell County Superior Court on 16 May 2025.  (*See* ECF No. 3.)

73.    The Companies subsequently filed an Amended Complaint on 9 June 2025, which named Abell, Magee, O'Reilly, Stanley, and Cher Abell as Defendants. In the Amended Complaint, the Companies asserted claims against Defendants for: (1) specific performance; (2) breach of fiduciary duty; (3) constructive fraud; (4) breach of contract; (5) misappropriation of trade secrets pursuant to N.C.G.S. § 66-152 *et seq.*, and 18 U.S.C. § 1836 *et seq.*; (6) conspiracy and aiding and abetting misappropriation of trade secrets; (7) tortious interference with contractual and business relationships; (8) unfair and deceptive trade practices ("UDTP"); (9) unauthorized access to computer systems pursuant to N.C.G.S. § 14-458 and 18 U.S.C. § 1030; (10) conversion; (11) forgery/fraudulent inducement; (12) declaratory relief; and (13) injunctive relief.

74.    Four days later, on 13 June 2025, the Companies filed a Notice of Voluntary Dismissal Without Prejudice pursuant to Rule 41 of the North Carolina Rules of Civil Procedure, dismissing their federal claims under 18 U.S.C. §§ 1030 and 1836.  (ECF No. 7.)

75. This matter was subsequently designated as a mandatory complex business case and assigned to the undersigned on 17 June 2025. (ECF Nos. 1–2.)

76. On 17 July 2025, Defendants filed their present Motion to Dismiss requesting that the Court dismiss some, but not all, of the Companies' claims.

77. That same day, Abell and Magee filed the Counterclaims against the Companies for (1) breach of contract (indemnification); (2) breach of contract (advancement); (3) breach of information rights and accounting pursuant to N.C.G.S. § 57D-3-04 and Del. Code Ann. tit. 6, § 18-305; (4) breach of the implied covenant of good faith and fair dealing; (5) UDTP; (6) judicial dissolution pursuant to N.C.G.S. § 57D-6-01 *et seq.*; (7) judicial dissolution pursuant to *Meiselman*; and (8) declaratory judgment.

78. At the same time, Abell and Magee also filed a Third-Party Complaint and asserted the following claims against Graham and Knox Hill: (1) individual claims for breach of fiduciary duty; (2) individual claims for constructive fraud; (3) a derivative claim on behalf of Highlights and Empyrean for corporate waste/self-dealing; and (4) a derivative claim on behalf of Highlights and Empyrean for breach of fiduciary duty. Abell and Magee have also requested that the Court "pierce the corporate veil" by holding Graham individually liable for any conduct attributable to Knox Hill.

79. The Companies filed their Motion to Dismiss Abell and Magee's Counterclaims on 29 August 2025; and the Third-Party Defendants filed their Motion to Dismiss the claims in the Third-Party Complaint on 22 September 2025.

80.     This matter came on for a hearing before the Court on 22 January 2026, at which all parties were represented by counsel.  (*See* ECF No. 88.)

81.     Having been fully briefed, the Motions are now ripe for resolution.

**LEGAL STANDARD**

82.     In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations in the complaint in the light most favorable to the plaintiff. *See Christenbury Eye Ctr., P.A. v. Medflow, Inc.*, 370 N.C. 1, 5 (2017).  The Court's inquiry is "whether, as a matter of law, the allegations of the complaint . . . are sufficient to state a claim upon which relief may be granted under some legal theory[.]"  *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670 (1987).  The Court accepts all well-pled factual allegations in the relevant pleading as true.  *See Krawiec v. Manly*, 370 N.C. 602, 606 (2018).  The Court is therefore not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Good Hope Hosp., Inc. v. N.C. Dep't Health and Hum. Servs., Div. of Facility Servs.*, 174 N.C. App. 266, 274 (2005) (cleaned up).

83.     Furthermore, the Court "can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the complaint."  *Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 206 (2016) (cleaned up).  The Court may consider these attached or incorporated documents without converting the Rule 12(b)(6) motion into a motion for summary judgment. *Id.* (citation omitted).  Moreover, the Court "may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers

even though they are presented by the defendant." *Oberlin Cap., L.P. v. Slavin*, 147 N.C. App. 52, 60 (2001) (cleaned up).

84. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when (1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim." *Corwin v. Brit. Am. Tobacco PLC*, 371 N.C. 605, 615 (2018) (cleaned up).

## ANALYSIS

85. Presently before the Court are three pending Motions to Dismiss—one brought by Defendants; one brought by the Companies; and one brought by Third-Party Defendants.

86. At the outset, the Court notes that its task in ruling on these Motions has been made significantly more difficult and time-consuming as a result of the parties engaging in the practice of "group pleading" by lumping together all claimants and opposing parties without specifically enumerating (1) which Plaintiff, Counterclaim-Plaintiff, or Third-Party Plaintiff is asserting a particular claim, or (2) which specific entity or individual is responsible for committing the allegedly wrongful act giving rise to that claim. The Court takes this opportunity to express its strong disapproval of this practice. *See Zhang v. CapitalNexus, LLC*, 2026 NCBC LEXIS 133, at *19 (N.C. Super. Ct. June 25, 2026) (noting that group pleading "frustrates the basic purpose of pleading, which is to give defendants in the litigation notice of what they are supposed to have done wrong[ ]").

## I.     Defendants' Motion to Dismiss

87.     Defendants request that the Court dismiss the Companies' claims for: (1) specific performance; (2) breach of fiduciary duty; (3) constructive fraud; (4) breach of contract; (5) misappropriation of trade secrets; (6) conspiracy and aiding and abetting misappropriation of trade secrets; (7) tortious interference with contractual and business relationships; (8) UDTP; (9) unauthorized access to computer systems; and (10) forgery/fraudulent inducement.[5]

88.     Initially, at the 22 January hearing on the Motions, counsel for the Companies acknowledged that the Companies intended to assert only the following claims against Cher Abell: misappropriation of trade secrets, UDTP, and forgery/fraudulent inducement. (Hearing Tr., at 10–13, 52, 58, 61–62.) Accordingly, all other claims asserted against her by the Companies in the Amended Complaint are **DISMISSED** with prejudice.

89.     The Court will address the parties' arguments with respect to each of the Companies' claims accordingly.

### A.     Specific Performance

90.     As their first cause of action in the Amended Complaint, the Companies have asserted a claim for specific performance against Abell and Magee and request that the Court enter an order compelling Abell and Magee to relinquish their

---

[5] Defendants have not sought dismissal of the Companies' claims for conversion (against Abell) and declaratory relief (against Abell and Magee).

respective ownership interests in each of the Companies pursuant to the terms of the Unit Repurchase Agreements.

91. In seeking dismissal of this claim, Abell and Magee make two arguments: (1) specific performance is a remedy rather than a standalone cause of action; and (2) the Unit Repurchase Agreements were not valid contracts with definite and enforceable terms.

92. This Court has recently stated the following with respect to a request for specific performance:

> "The remedy of specific performance is available to compel a party to do precisely what he ought to have done without being coerced by the court." *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694 (1981). "To receive specific performance, the law requires the moving party to prove that (i) the remedy at law is inadequate, (ii) the obligor can perform, and (iii) the obligee has performed [their] obligations." *Reeder v. Carter*, 226 N.C. App. 270, 275 (2013). Generally, "specific performance of a contract is decreed only when it is equitable to do so." *Hutchins v. Honeycutt*, 286 N.C. 314, 318 (1974). "The party claiming the right to specific performance must show the existence of a valid contract, its terms, and either full performance on [their] part or that [they] [are] ready, willing and able to perform." *Munchak*, 301 N.C. at 694. "Specific performance will not be decreed unless the terms of the contract are so definite and certain that the acts to be performed can be ascertained and the court can determine whether or not the performance rendered is in accord with the contractual duty assumed." *N.C. Med. Soc'y v. N.C. Bd. of Nursing*, 169 N.C. App. 1, 12 (2005).
>
> Moreover, specific performance is an equitable remedy that "rests in the sound discretion of the trial court and is conclusive on appeal absent a showing of a palpable abuse of discretion." *Diener v. Brown*, 290 N.C. App. 273, 277 (2023) (quoting *Crews v. Crews*, 264 N.C. App. 152, 154 (2019) (quotation marks and citation omitted)). "Because specific performance rests in the Court's discretion, the only role for a jury is to decide any disputed facts." *Durham Coca-Cola Bottling Co. v. Coca-Cola Bottling Co. Consol.*, 2003 NCBC LEXIS 5, at *35 (N.C. Super. Ct. Apr. 28, 2003).

*Vincelette v. Court*, 2025 NCBC LEXIS 94, at *29–30 (N.C. Super. Ct. July 30, 2025).

93. Because specific performance is an equitable *remedy* as opposed to a claim for relief, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED** and that this claim should be **DISMISSED** without prejudice to the Companies' right to pursue specific performance as an equitable remedy in connection with a validly pled cause of action. *See Vereen v. Holden*, 121 N.C. App. 779, 785 (1996) ("[W]e affirm the dismissal of [plaintiff's] specific performance 'claim' as it is a remedy for breach of contract."); *Howard v. IOMAXIS, LLC*, 2026 NCBC LEXIS 139, at *28 (N.C. Super. Ct. July 15, 2026) (granting a motion to dismiss because "[s]pecific performance is a remedy . . , not an independent cause of action[ ]"); *see also Cranford v. Hintz*, 2026 NCBC LEXIS 88, at *26 (N.C. Super. Ct. Apr. 15, 2026) (noting that the dismissal of "claims" that are more appropriately classified as "remedies" are "without prejudice and do[ ] not prevent the Court from awarding, nor [p]laintiff from seeking, th[ose] exact remedies later on in th[e] litigation upon a showing of factual and legal entitlement[ ]").

### B.      Breach of Fiduciary Duty and Constructive Fraud

94. With respect to the Companies' claims for breach of fiduciary duty and constructive fraud, the Companies have alleged that Abell has improperly established—or at least become affiliated with—a competing business; disclosed the Companies' confidential information to the competing business; and used his position as the Companies' general counsel to execute unauthorized promissory notes that were payable to himself and his wife, Cher Abell.

95. In support of their Motion to Dismiss, Defendants contend that these two claims fail for the following three reasons: (1) Abell did not owe fiduciary duties to the Companies at the time of his alleged breaches; (2) the Companies have not been harmed by Abell's purported breaches; and (3) Abell did not obtain a personal benefit as a result of his alleged conduct.

96. At the 22 January hearing, counsel for both the Companies and Defendants agreed that the Companies' claims for breach of fiduciary duty and constructive fraud are governed by Delaware law with respect to Highlights and Empyrean but are governed by North Carolina law with respect to HLRE.

**(1)     Breach of Fiduciary Duty**

97. As a practical matter, North Carolina and Delaware law are substantively identical for the purpose of addressing the arguments presented by the parties regarding the Companies' claim for breach of fiduciary duty.

98. It is well settled that to establish a claim for breach of fiduciary duty under North Carolina law, "a plaintiff must show that: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 339 (2019) (cleaned up). Likewise, under Delaware law, "[t]o plead a claim for breach of fiduciary duty, a complaint need only address two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *MacLaughlan v. Einheiber*, 354 A.3d 864, 890 (Del. Ch. 2026) (cleaned up).

99. With respect to Defendants' argument that Abell owed no fiduciary duties to the Companies at the time of his purported breaches, although the Amended Complaint is less than a model of clarity, it appears to allege that he owed—and subsequently breached—fiduciary duties to the Companies by virtue of his employment as their CEO and general counsel.

100. It is well recognized that "corporate officers owe fiduciary duties that are identical to those owed by corporate directors." *Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009) (cleaned up); *see also Seraph Garrison, LLC v. Garrison*, 247 N.C. App. 115, 119 (2016) ("[C]orporate directors and officers act in a fiduciary capacity in the sense that they owe the corporation the duties of loyalty and due care."). This same principle applies to the officers of a limited liability company. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 842–46 (Del. Ch. 2022) (holding an officer of a limited liability company owed fiduciary duties to the company); *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at *12 (N.C. Super. Ct. June 9, 2021) (holding that officers of a limited liability company owe fiduciary duties "by virtue of [their] position at the company[ ]").

101. Indeed, the roles of CEO and general counsel are included in the ambit of management positions that have been found to give rise to such duties. *See Truist Fin. Corp. v. Rocco*, 2024 NCBC LEXIS 62, at *33–34 (N.C. Super. Ct. Apr. 25, 2024) (concluding that a company's CEO was "a company official" as defined under North Carolina's Limited Liability Company Act and therefore owed fiduciary duties to the company); *JJS, Ltd. v. Steelpoint CP Holdings, LLC*, 2019 Del. Ch. LEXIS 1308, at

*24 (Del. Ch. Oct. 11, 2019) (denying a motion to dismiss and concluding that the company's officers, including the CEO, "owe[d] fiduciary duties akin to those of directors of a corporation[ ]"); *In re World Health Alts., Inc.*, 385 B.R. 576, 591 (Bankr. D. Del. 2008) (holding that a company's general counsel was an "officer" and "owe[d] fiduciary allegiance to the corporation as [an] officer[ ]"); *see also In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 776–77 (Del. Ch. 2005) (analyzing whether a company's general counsel breached his fiduciary duties to the company).

102. Read in the light most favorable to the Companies, the Amended Complaint sufficiently alleges that Abell owed fiduciary duties to the Companies by virtue of his role as an officer and that he subsequently engaged in conduct that breached those duties. *See Barings LLC v. Fowler*, 2025 NCBC LEXIS 18, at *21–22 (N.C. Super. Ct. Feb. 13, 2025) (concluding that the plaintiff's allegations that its former officer "conspired . . . to carry out an unlawful scheme and concealed it" from the company was sufficient at the Rule 12 stage to "give rise to an inference that [defendant's] actions went beyond mere preparations to compete and contravened his duties of good faith and loyalty[ ]"); *BrandRep, LLC v. Ruskey*, 2019 Del. Ch. LEXIS 3, at *13–14 (Del. Ch. Jan. 7, 2019) (denying a motion to dismiss a claim for breach of fiduciary duty where the plaintiff alleged that the defendant "was a director and officer of" the limited liability company when he "misappropriat[ed] [plaintiff's] software" and "misled [plaintiff]" about his affiliation with a competing entity).

103. Regarding Defendants' second argument—that the Companies have failed to allege any harm resulting from Abell's misconduct—neither North Carolina

nor Delaware courts require a plaintiff to plead actual damages in order to state a claim for breach of fiduciary duty.

104. Indeed, our Supreme Court has stated as follows with respect to the "injury" requirement for a claim of breach of fiduciary duty under North Carolina law:

> Although this Court has not previously addressed the issue of whether a plaintiff is required to prove actual damages in support of breach of fiduciary duty and constructive fraud claims, the Court of Appeals has addressed this issue on a number of occasions. . . .
>
> . . .
>
> As a result of our belief that the Court of Appeals decisions discussed above were correctly decided, we adopt the reasoning of the Court of Appeals and hold that potential liability for nominal damages is sufficient to establish the validity of claims for breach of fiduciary duty and constructive fraud and can support an award of punitive damages. Aside from the fact that nothing in the prior decisions of this Court indicates that proof of actual injury is necessary in order to support a claim for breach of fiduciary duty or constructive fraud, we see no basis for treating the incurrence of nominal damages as a second-class legal citizen in this context, particularly given that such damages do reflect the existence of a legal harm and the fact that the policy of North Carolina law is to discourage breaches of fiduciary duty and acts of constructive fraud.

*Chisum v. Campagna*, 376 N.C. 680, 703, 705 (2021) (cleaned up); *see also Leo Invs. H.K. Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1192–93 (Del. Ch. 2025) (recognizing that "a claim for breach of fiduciary duty has only two formal elements[ ]" and that "[a] court may award nominal damages when a breach does not warrant a meaningful remedy[ ]").

105. As such, the Court need not determine at the present stage whether— and to what extent—the Amended Complaint has alleged that Abell's purported

breaches of fiduciary duty actually caused harm to the Companies. *See Loyd v. Griffin*, 2021 NCBC LEXIS 72, at *11 n.6 (N.C. Super. Ct. Sept. 1, 2021) (denying a motion to dismiss a counterclaim for breach of fiduciary duty because "even if [d]efendants ultimately fail to prove actual damages on their breach of fiduciary duty [c]ounterclaim . . , the absence of such evidence alone would not defeat their claim[ ]").

106. Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to the Companies' claim for breach of fiduciary duty against Abell.

### (2)    Constructive Fraud

107. Abell further asserts that dismissal of the Companies' claim for constructive fraud is proper because there are no allegations that he received a personal benefit as a result of his purported breaches of fiduciary duty.

108. North Carolina and Delaware law are not identical with respect to claims for constructive fraud. Accordingly, the Court will first address the claim to the extent it is brought by HLRE before then turning to Highlights's and Empyrean's alleged bases for the claim.

109. With respect to HLRE's claim for constructive fraud—which the parties agree is governed by North Carolina law—our Supreme Court has recognized that the elements of a constructive fraud claim largely overlap with the elements of a claim for breach of fiduciary duty. *See Chisum*, 376 N.C. at 706–07. The elements of a claim for constructive fraud are: "(1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White v. Consol. Plan. Inc.*, 166 N.C. App.

283, 294 (2004) (cleaned up). "The primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself." *Id.*

110. Although the relevant allegations in the Amended Complaint are somewhat cursory, it appears that the Companies have alleged that Abell negotiated, drafted, and executed various agreements—including the purported Unit Repurchase Agreements—in his capacity as HLRE's general counsel and CEO on terms that were designed to benefit himself at the company's expense.

111. Such allegations—which the Court must accept as true when ruling on a motion under Rule 12(b)(6)—are minimally sufficient to satisfy North Carolina's low bar of notice pleading for claims of constructive fraud. *See Islet Scis., Inc. v. Brighthaven Ventures, LLC*, 2017 NCBC LEXIS 3, at *23–25 (N.C. Super. Ct. Jan. 12, 2017) (finding that allegations that the defendants "unilaterally chang[ed] the terms of" certain agreements and negotiated agreements "on terms highly unfavorable to [plaintiff]" to benefit themselves were sufficient to state a claim for constructive fraud); *see also Nelson v. All. Hosp. Mgmt., LLC*, 2011 NCBC LEXIS 43, at *24 (N.C. Super. Ct. Nov. 22, 2011) (denying a motion to dismiss and stating that "[t]he allegations . . . rest on a slender reed[ ]" and that even though the plaintiff "may not be able to support this broad claim with actual proof[,]" no more is required at the pleading stage).

112. Accordingly, Defendants' Motion to Dismiss is **DENIED** with respect to HLRE's claim for constructive fraud against Abell.

113. However, with respect to the claim for constructive fraud asserted by Highlights and Empyrean—which the parties agree is governed by Delaware law—Delaware courts have held as follows:

> The concept of constructive fraud is an ill-defined one, but generally exists to prevent wrongdoing by someone who occupies a special position of confidence or trust, such as that of a fiduciary. Our corporate case law has thrown this concept around in a not particularly precise way, but always in a context in which the court is examining whether directors have complied with their fiduciary duties.

*Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1236 (Del. Ch. 2001) (cleaned up), *rev'd on other grounds*, 817 A.2d 149 (Del. 2002).

114. Indeed, Delaware courts have repeatedly rejected the assertion that constructive fraud exists as a "separate, independent tort" where the challenged conduct "describ[es]" or is "duplicative" of a claim for breach of fiduciary duty. *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 643 (Del. Ch. 2013) (cleaned up); *see also In re Wayport, Inc. Litig.*, 76 A.3d 296, 327 (Del. Ch. 2013) (concluding that "the breach of fiduciary duty count confronts directly the implications of the fiduciary relationship, rendering the constructive fraud count redundant and superfluous[ ]"); *Bamford v. Penfold, L.P.*, 2020 Del. Ch. LEXIS 79, at *84 (Del. Ch. Feb. 28, 2020) (concluding that a claim for constructive fraud was "duplicate[d] and [ ] subsumed within the double-derivative claim for breach of fiduciary duty").

115. Because Highlights's and Empyrean's claim for constructive fraud against Abell is predicated on the same conduct that forms the bases for their breach of fiduciary duty claim against him, Defendants' Motion to Dismiss is **GRANTED**, and those claims are **DISMISSED** with prejudice.

### C. Breach of Contract

116. In the Amended Complaint, the Companies allege that Abell and Magee have each breached various provisions contained in the Restrictive Covenants, including the non-competition, non-solicitation, and confidentiality provisions.

117. As an initial matter, while the Restrictive Covenants do not contain a contractual choice-of-law provision, at the 22 January hearing on the Motions, the parties agreed that the interpretation of the Restrictive Covenants—and Highlights's claim for breach thereof—are governed by North Carolina law. (Hearing Tr., at 10–11, 13.)

118. Under North Carolina law, "[t]he elements of a claim for breach of contract are (1) [the] existence of a valid contract and (2) breach of the terms of that contract. The elements of a valid contract are offer, acceptance, consideration, and mutuality of assent to the contract's essential terms." *Davis v. Woods*, 286 N.C. App. 547, 561 (2022) (cleaned up).

119. In seeking dismissal of this claim, Abell and Magee contend that (1) the Restrictive Covenants are not enforceable contracts as a general proposition because Abell and Magee received no consideration from Highlights in exchange for the agreements; and (2) the non-competition provision, specifically, is unenforceable

because it is overly broad and not reasonably calculated to protect Highlights's business interests.[6] The Court will consider each of these arguments in turn.[7]

### (1) Consideration

120. Under North Carolina law, "[c]onsideration sufficient to support a contract consists of any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." *Elliott v. Enka-Candler Fire & Rescue Dep't, Inc.*, 213 N.C. App. 160, 163 (2011) (cleaned up). Ultimately, "the consideration and the promise bear a reciprocal relation of motive or inducement" such that the "consideration induces the making of the promise and the promise induces the furnishing of the consideration." *Davis*, 286 N.C. App. at 562 (cleaned up).

121. With respect to the consideration received by Abell and Magee in connection with the Restrictive Covenants, Section 1 of the Restrictive Covenants states as follows:

---

[6] To the extent that Abell and Magee have also asserted that dismissal is proper because Empyrean and HLRE are not third-party beneficiaries to the Restrictive Covenants—and thus do not have standing to assert a breach of contract claim thereunder—the Court need not reach this issue because the Amended Complaint specifically captions this claim as being asserted solely by Highlights. (Am. Compl., at 20 ("Breach of Contract, Highlights v. Defendants Magee and Abell").) Moreover, at the 22 January hearing on the Motions, counsel for the Companies confirmed that Highlights is the sole Plaintiff with respect to this claim. (*See* Hearing Tr., at 10.)

[7] As noted above, because the terms of the Restrictive Covenants applicable to Abell and Magee are substantively identical, the Court will analyze the parties' arguments on this issue without differentiating between Abell and Magee. *See, e.g., Xchange Tech. Rentals LLC v. UK Atlanta Holdings, LLC*, 2026 NCBC LEXIS 91, at *53 n.13 (N.C. Super. Ct. Apr. 10, 2026) (analyzing contract claims together where "the parties agree[d] that the relevant portions of each of the [contracts] [we]re substantively identical[ ]").

> Mutual Agreement.    Investor acknowledges the importance to the LLC and its Affiliates of protecting their Confidential Information and other legitimate business interests, including the valuable trade secrets and good will that they have developed or acquired. *In consideration of the issuance of Securities to Investor and other good and valuable consideration*, the receipt and sufficiency of which the Investor hereby acknowledges, the Investor agrees that the following restrictions on the Investor's activities during and after Investor's status as a Unitholder are reasonable and necessary to protect the legitimate interests of the LLC and its Affiliates.

(Am. Compl. Ex. B, at 1; Am. Compl. Ex. C, at 1 (emphasis added).)

122. Although it is not entirely clear, it appears that the phrase "issuance of Securities" was intended to reference the execution of the original "Unit Purchase Agreements" and Highlights's Operating Agreement.

123. According to Highlights's Operating Agreement, the Unit Purchase Agreements authorized Highlights to issue seventy-five "Class A Units" to Magee in exchange for a $75,000 capital contribution and fifty "Class A Units" to Abell in exchange for a $50,000 capital contribution. (Am. Compl. Ex. A, at 70.) "Class A Units" are defined by Highlights's Operating Agreement as "representing a fractional part of the interest . . . in Profits, Losses and Distributions" of the company. (Am. Compl. Ex. A, at 6.)

124. In support of Defendants' Motion, Abell and Magee assert that the Unit Purchase Agreements and the issuance of "Class A Units" in Highlights cannot serve as consideration for the Restrictive Covenants because (1) limited liability companies cannot issue securities in the form of equity shares; and (2) as Highlights's founders, Abell and Magee owned their equity interests in Highlights prior to entering into the Unit Purchase Agreements. The Court is not persuaded.

125. First, Delaware's Limited Liability Company Act explicitly contemplates that the membership and management of a limited liability company can be divided according to classes—akin to shares in a corporation. *See* Del. Code Ann. tit. 6, § 18-302 ("A limited liability company agreement may provide for classes or groups of members having such relative rights, powers and duties as the limited liability company agreement may provide[.]"); Del. Code Ann. tit. 6, § 18-404 ("A limited liability company agreement may provide for classes or groups of managers having such relative rights, powers and duties as the limited liability company agreement may provide[.]").

126. Accordingly, because Abell and Magee have not shown that the issuance of the "Class A Units" was done in contravention of the terms of Highlights's Operating Agreement, the Court is unable to conclude at the pleadings stage that the members of Highlights were not free to divide their equity interests in the company through the issuance of various securities, such as the "Class A Units." *See Gurney-Goldman v. Goldman*, 321 A.3d 559, 589 (Del. Ch. 2024) (noting that a limited liability company's operating agreement may "create classes of member units that resemble common and preferred shares" or "incorporate other corporate features[ ]").

127. Second, even though Abell and Magee may have held ownership interests in Highlights prior to the execution of the Unit Purchase Agreements, such ownership interests were supplanted upon their voluntary execution of Highlights's Operating Agreement. *See R&R Cap., LLC v. Buke & Doe Run Valley Farms, LLC*, 2008 Del. Ch. LEXIS 115, at *22 n.30 (Del. Ch. Aug. 19, 2008) (noting that once

executed, "[t]he operating agreement generally controls except to the extent that it is inconsistent with mandatory statutory provisions[ ]").

128.     Taking the allegations in the Amended Complaint as true and viewing them alongside the terms of the Restrictive Covenants and Highlights's Operating Agreement, the Court is satisfied that the Amended Complaint has sufficiently alleged that the Restrictive Covenants were supported by consideration.[8]  *See Lee v. Scarborough*, 164 N.C. App. 357, 364 (2004) (rejecting the argument that a contract was not supported by consideration where "[t]he recital on the face of the [a]greement . . . specifically recite[d] that the contract [was] supported by adequate consideration[ ]").

### (2)     Non-Competition Provision

129.     As it relates to Defendants' arguments specifically concerning the enforceability of the non-competition provision, the Restrictive Covenants state, in relevant part, as follows:

> 4.1.     Other than Investor's current employment, while the Investor or an Immediate Family Member of the Investor is a Unitholder of the LLC or an Affiliate and during the twelve (12)-month period immediately following the date the Investor ceases to be a Unitholder (the "Non-Compete Period"), the Investor agrees to not, directly or indirectly, whether as owner, partner, investor, consultant, agent, employee, co-venturer or otherwise, engage in the business of ABA Therapy ("the Business") in any geographic area in which the LLC or any of its Affiliates engage in the Business or are actively planning to engage in the Business during the period Investor is a Unitholder or, with respect

---

[8] This ruling is without prejudice to Abell and Magee's right to reassert this issue at a later stage of the litigation based on a more fully developed factual record.  *See, e.g., Samonds v. Cloninger*, 189 N.C. 610, 612 (1925) (noting that "the recital of a consideration in the contract is not conclusive as to the consideration further than the contractual nature of th[e] recital extends[ ]").

to the portion of the Non-Compete Period that follows the date the Investor ceases to be a Unitholder, at the time of such cessation (the "Restricted Area"), or undertake any planning to do any of the foregoing anywhere in the Restricted Area. Specifically, but without limiting the foregoing, the Investor agrees not to work or provide services, in any capacity, anywhere in the Restricted Area, whether as an employee, independent contractor or otherwise, whether with or without compensation, to any Person that is engaged in the Business; provided that notwithstanding the foregoing, that for purposes of this Agreement, the Investor may engage in (i) owning, directly or indirectly, solely as an investment, up to five percent (5%) of any class of securities of any LLC (whether public or private) that is competitive or substantially similar to the Business; (ii) owning a passive equity interest in a private debt or equity investment fund in which the Investor does not have the ability to control or exercise any managerial influence over such fund; or (iii) any activity consented to in advance in writing by the LLC.

(Am. Compl. Ex. B, at 3; Am. Compl. Ex. C, at 3.)

130. Restrictive covenants "are not viewed favorably in modern law," *Farr Associates, Inc. v. Baskin*, 138 N.C. App. 276, 279 (2000) (cleaned up), and will only be enforced if "reasonably necessary to protect [a] legitimate business interest," *Triangle Leasing Co., Inc. v. McMahon*, 327 N.C. 224, 229 (1990) (cleaned up).

131. "The party who seeks enforcement of the [restrictive] covenant has the burden of proving the reasonableness of the agreement." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655 (2009) (cleaned up). "The reasonableness of a [restrictive] covenant is a matter of law for the Court to decide." *Id.* (cleaned up).

132. Factors that North Carolina courts have considered in assessing the reasonableness of non-competition provisions entered into by members of a limited liability company include:

(1) the area, or the scope of the restriction; (2) the area in which the employee actually worked or was subject to work; (3) the area in which the employer operated; (4) the nature of the business involved; (5) the

nature of the employee's duty and his knowledge of the employer's business operation; and (6) the good will of the business.

*Emrich Enters., LLC v. Hornwood, Inc.*, 2020 NCBC LEXIS 45, at *36 (N.C. Super. Ct. Apr. 8, 2020) (cleaned up).

133. Upon careful review, the Court concludes that the terms of the non-competition provision of the Restrictive Covenants are facially overbroad and are unenforceable as a matter of law for the reasons set forth below.

134. First, the non-competition provision purports to restrict Abell and Magee from "directly or indirectly" engaging in the business of ABA therapy. However, North Carolina courts have, on a number of occasions, refused to enforce non-competition provisions using the phrase "directly or indirectly." *See Prometheus Grp. Enters., LLC v. Gibson*, 2023 NCBC LEXIS 42, at *14 (N.C. Super. Ct. Mar. 21, 2023) ("Not only does this non-compete use the disfavored 'directly or indirectly' phrase, it compounds the problem by purporting to prohibit Gibson from accepting employment of *any* kind with *any* business if that business engages in a 'Restricted Business' in *any* way."); *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *31–32 (N.C. Super. Ct. Nov. 3, 2011) ("North Carolina courts have refused to enforce non-competition clauses using the terms 'directly or indirectly.' "); *CNC/Access, Inc. v. Scruggs*, 2006 NCBC LEXIS 22, at *24 (N.C. Super. Ct. Nov. 17, 2006) (holding that prohibiting a party "from even indirect ownership of a competing company . . . cannot be seen as protecting a legitimate business interest").

135. Second, the geographic scope of the non-competition provision is overly broad because the phrase "geographic area" is not specifically defined. *See Farr*

*Assocs., Inc.*, 138 N.C. App. at 282 (finding a non-competition agreement unenforceable where its scope was "unduly vague" and failed to define key terms); *PDF Elec. & Supply Co., LLC v. Jacobsen*, 2020 NCBC LEXIS 103, at \*20 (N.C. Super. Ct. Sept. 9, 2020) (holding that a non-competition provision was unenforceable based on its use of "vague, broad terms" because such undefined terms prevented the court from being able to "determine the intended scope of the prohibition[ ]").

136. Third, because the non-competition provision extends to any areas in which the Companies may "actively plan[ ] to" conduct business, its restrictions are not narrowly tailored to the areas in which Abell and Magee worked, the areas in which Highlights conducts business, or the areas in which Highlights has existing good will. Furthermore, the phrase "actively planning to engage in the Business" is problematic in that it is inherently nebulous.

137. Weighing each of the relevant factors together, the Court agrees with Defendants that the terms of the non-competition provision are facially overbroad and not sufficiently narrowly tailored to protect Highlights's legitimate business interests.

138. At the 22 January hearing on the Motions, counsel for the Companies— for the first time—suggested that the Court's use of the blue pencil doctrine could remedy potential problems as to the scope of the non-competition provision. (Hearing Tr., at 37–38.) However, nowhere in the Companies' brief in opposition to Defendants' Motion to Dismiss did the Companies request blue penciling. (*See generally* ECF No. 45.)

139. Pursuant to Business Court Rule 7.2, all parties "must brief the matters they intend to discuss at a hearing on the motion." BCR 7.2. Because the Companies elected not to make any arguments in their briefing on the present Motion concerning why and how it would be proper for the Court to exercise its blue pencil authority in connection with the non-competition provision, such an argument is deemed waived. *See Gvest Real Est., LLC v. JS Real Est. Invs., LLC*, 388 N.C. 563, 570 (2025) (affirming this Court's conclusion that a party "had waived any argument" that it failed to brief pursuant to BCR 7.2); *Eepes Logistics Servs., Inc. v. De Piante*, 2025 NCBC LEXIS 25, at *68–69 (N.C. Super. Ct. Mar. 11, 2025) (declining to address arguments that were not presented in the party's brief); *see also Vanguard Pai Lung, LLC v. Moody*, 2023 NCBC LEXIS 84, at *10 (N.C. Super. Ct. June 27, 2023) (noting that the purpose of BCR 7.2 "is to define clearly the issues presented to the Court and to present the arguments and authorities upon which the parties rely").

140. As such, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED** and that Highlights's claim for breach of the non-competition provision of the Restrictive Covenants against Abell and Magee should be **DISMISSED** with prejudice.[9]

---

[9] The Court notes that dismissal of Highlights's claim for breach of the non-competition provision against Magee is also proper for an additional reason because—as was conceded by counsel for the Companies at the 22 January hearing on the Motions—the Amended Complaint does not allege that Magee has taken any actions that would actually constitute a breach of the non-competition provision as it relates to his affiliation with a competitor engaged in the business of providing ABA therapy services. (Hearing Tr., at 38, 53.)

### D.    Misappropriation of Trade Secrets

141.    North Carolina's Trade Secrets Protection Act ("NCTSPA") provides that "[t]he owner of a trade secret shall have [a] remedy by civil action for misappropriation of his trade secret."  N.C.G.S. § 66-153.

142.    The NCTSPA defines a "trade secret" as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

    a.    Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

    b.    Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3).

143.    In support of their Motion to Dismiss, Defendants contend that the Amended Complaint (1) fails to identify the Companies' purported trade secrets with sufficient specificity; (2) fails to allege that the information was subject to reasonable security measures; and (3) fails to allege that any acts of misappropriation occurred within the State of North Carolina.  The Court will address each of these arguments in turn.

144.    First, with respect to the Companies' identification of their purported trade secrets, the Companies have clarified in their response brief that their misappropriation of trade secrets claim is predicated on their allegations that Abell—

without authorization—sent a copy of the NIFO Model to Blue as part of his plan to establish a competing hospice company.

145. At the 22 January hearing on the Motions, counsel for the Companies represented that the NIFO Model belongs to Empyrean and contains detailed financial information—including actual and projected costs, revenues, and profits—for the first twelve months of operation for one of Empyrean's facilities. (Hearing Tr., at 40.)

146. Because the Companies concede that Empyrean is the alleged owner of the NIFO Model, the Court concludes that—to the extent the misappropriation of trade secrets claim has been asserted by Highlights and HLRE—Defendants' Motion to Dismiss should be **GRANTED**, and the claim should be **DISMISSED** with prejudice. *See, e.g., Panos v. Timco Engine Ctr., Inc.*, 197 N.C. App. 510, 518 (2009) (noting that only "the owner of a trade secret may bring a civil action for the misappropriation of the trade secret[ ]").

147. In assessing whether a compilation of information, such as the NIFO Model, constitutes a protectable trade secret, North Carolina courts consider the following factors:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known to employees and others involved in the business; (3) the extent of measures taken to guard secrecy of the information; (4) the value of information to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Wells Fargo Ins. Servs. U.S.A., Inc. v. Link*, 2018 NCBC LEXIS 42, at *34 (N.C. Super. Ct. May 8, 2018) (cleaned up), *aff'd per curiam*, 372 N.C. 261, 278 (2019).

148. Having thoroughly reviewed the financial information contained in the unredacted copy of the NIFO Model—which the Court allowed to be filed under seal— the Court is satisfied that Empyrean has identified its purported trade secret with sufficient specificity. *See GE Betz, Inc. v. Conrad*, 231 N.C. App. 214, 234 (2013) (affirming the denial of a motion to dismiss where the plaintiff identified its trade secret as a compilation of its "pricing information, customer proposals, historical costs, and sales data"); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375 (2001) (holding that "confidential cost history records" and "[c]onfidential data regarding operating and pricing policies can also qualify as trade secrets[ ]").

149. However, because this claim is based on Abell emailing the NIFO Model to Blue without authorization, the Companies have failed to allege any acts of misappropriation specifically attributable to Magee, O'Reilly, Stanley, or Cher Abell. *See Kadah v. Paladin Drones, Inc.*, 2026 NCBC LEXIS 119, at *29 (N.C. Super. Ct. June 2, 2026) (noting that "a pleading must also set forth with sufficient specificity the acts by which the alleged misappropriation occurred[ ]").

150. Indeed, the Amended Complaint is completely devoid of any allegations indicating that Magee, O'Reilly, Stanley, or Cher Abell either obtained, disclosed, or used the NIFO Model prior to the initiation of the present action.[10]  Absent such

---

[10] To the extent that the Companies contend that Magee, O'Reilly, Stanley, and Cher Abell may—at some unidentified point in time—have had the opportunity to obtain the NIFO Model from Abell, our Supreme Court has recently clarified that a claim for misappropriation of trade secrets requires that the plaintiff allege that the defendant had "a *specific* opportunity to acquire" the trade secret. *Rel. Ins., Inc. v. Pilot Risk Mgmt. Consulting, LLC*, ___ N.C. ___, 2026 N.C. LEXIS 493, at *29 (N.C. May 22, 2026) (cleaned up and emphasis added).

allegations, the Companies' claim for misappropriation of trade secrets fails as a matter of law.

151. As such, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED** with respect to Defendants Magee, O'Reilly, Stanley, and Cher Abell and that the Companies' claim for misappropriation of trade secrets against them should be **DISMISSED** with prejudice.

152. Second, with respect to the reasonableness of the security measures used by Empyrean to protect the secrecy of the NIFO Model, the Amended Complaint alleges that (1) the NIFO Model was not known outside the business (Am. Compl. ¶ 146); (2) it was only disclosed to employees within Empyrean on a need-to-know basis (Am. Compl. ¶ 93); (3) access to the information was protected by the use of confidentiality agreements (Am. Compl. ¶ 145); and (4) it was protected by internal access controls and password protections (Am. Compl. ¶ 145).

153. While in later stages of the litigation it will, of course, be the Companies' burden to demonstrate that such security measures were reasonable under the particular circumstances of this case, the Court is satisfied that the allegations in the Amended Complaint—when viewed in the light most favorable to the Companies— are sufficient to survive a motion to dismiss under Rule 12(b)(6). *See Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at \*13–15 (N.C. Super. Ct. Oct. 21, 2016) (concluding that allegations of security measures including "password-protected login, controlled and permission-restricted access on a need-to-know basis,

and confidentiality policies and/or agreements[ ]" were "more than sufficient to survive a motion to dismiss[ ]").

154. Furthermore, although the Amended Complaint references that Empyrean provided *similar* information to Blue prior to Abell's alleged misappropriation, reading the allegations in the Amended Complaint in the light most favorable to the Companies, the Court cannot conclude at this early stage of the litigation whether the prior disclosure of *similar*, but not *identical*, information defeats Empyrean's claim. *See Campbell Sales Grp., Inc. v. Niroflex by Jiufeng Furniture, LLC*, 2022 NCBC LEXIS 148, at *23 (N.C. Super. Ct. Dec. 5, 2022) (noting that "the reasonableness of measures taken to protect the confidentiality of information claimed to be a trade secret is often appropriate for resolution by a jury[ ]").

155. Third, Defendants argue that the Amended Complaint fails to explicitly allege that Abell's purported act of misappropriation occurred in North Carolina and that this pleading omission is fatal to the Companies' claim.

156. In making this argument, Defendants rely on three cases from the United States District Court for the Western District of North Carolina. *See Recon Grp. LLP v. Lowe's Home Ctrs., LLC*, 743 F. Supp. 3d 737, 749 (W.D.N.C. 2024) (holding that "under the NCTSPA, a plaintiff must plead that the alleged misappropriation occurred in North Carolina[ ]" and dismissing the claim because the plaintiff "failed to plead that the alleged misappropriation occurred in North Carolina[ ]"); *Vanguard Grp., Inc. v. Snipes*, 2023 U.S. Dist. LEXIS 195218, at *25

(W.D.N.C. Aug. 31, 2023) (finding allegations insufficient where the pleading did "not provide enough information . . . as to where the alleged misappropriation took place[ ]"); *VRX USA, LLC v. VRX Ventures, Ltd.*, 2020 U.S. Dist. LEXIS 230494, at *20 (W.D.N.C. Dec. 7, 2020) (concluding that allegations that the defendants were "misappropriating and misusing" the plaintiff's trade secret failed because the complaint did not "stat[e] where or provid[e] any background that would allow the Court to draw a geographic inference[ ]" as to where the purported misappropriation occurred).

157. However, Defendants have not cited—nor has the Court been able to locate through its own independent research—any cases from North Carolina's appellate courts holding that a plaintiff must expressly allege that the complained-of misappropriation occurred in North Carolina in order to state a claim for misappropriation of trade secrets under the NCTSPA.

158. While the specific location where the misappropriation occurred may be relevant upon a more fully developed factual record, the Court is unpersuaded that the failure to allege this fact in the Amended Complaint subjects this claim to dismissal.

159. Moreover, given that the Amended Complaint alleges that Empyrean maintained its principal office in North Carolina and that its key executives (including Abell) worked out of its North Carolina office at various times, the Court cannot conclude as a matter of law that Empyrean's misappropriation claim lacks a sufficient connection to North Carolina. *See Barings LLC*, 2025 NCBC LEXIS 18, at

\*11–12 (concluding that allegations that the company's "principal place of business [was] in North Carolina[,]" that the company "transact[ed] business in North Carolina[,]" and that "North Carolina [was] where its injuries occurred" were sufficient to survive a motion to dismiss under Rule 12(b)(6)).

160. Accordingly, the Court concludes that Defendants' Motion to Dismiss Empyrean's claim for misappropriation of trade secrets against Abell should be **DENIED**.

### E. Conspiracy and Aiding and Abetting Misappropriation of Trade Secrets

161. Defendants also seek dismissal of the Companies' claim for "Conspiracy and Aiding and Abetting Misappropriation of Trade Secrets."

162. As an initial matter, to the extent that the Companies have attempted to assert a standalone claim for "aiding and abetting" misappropriation of trade secrets, such a claim does not appear to exist under North Carolina law. Indeed, in addressing a similarly captioned claim for "aiding and abetting misappropriation of trade secrets" under the federal Defend Trade Secrets Act, this Court stated as follows:

> Power Home includes in its Complaint a Count 4 titled "Aiding and Abetting Misappropriation of Trade Secrets by Defendants Sigora, and Hall Under the Defend Trade Secrets Act, 18 U.S.C. § 1831 *et seq*." Power Home fails to cite to any authority that the DTSA establishes a cause of action for aiding and abetting the misappropriation of trade secrets. The Court's research has revealed none either. Absent compelling authority recognizing such a claim, the Court declines to do so here. *See Infinity Tech., LLC v. Burney*, 2020 U.S. Dist. LEXIS 206604, at \*15–16 (E.D. Va. June 4, 2020) (declining to recognize a claim for aiding and abetting misappropriation of trade secrets); *C-Ville Fabricating, Inc. v. Tarter*, 2019 U.S. Dist. LEXIS 50373, at \*43–44 (E.D. Ky. Mar. 26, 2019) (same).

*Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at *42 (N.C. Super. Ct. June 18, 2021) (cleaned up).

163.    Because the Court's research (and the parties' briefing) has failed to disclose caselaw from North Carolina's appellate courts recognizing a claim for aiding and abetting misappropriation of trade secrets, the Court declines to recognize such a claim here.

164.    In order to state a valid claim for conspiracy, a plaintiff must allege: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros. v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350 (2011) (cleaned up).

165.    Notably, "[c]ivil conspiracy is not an independent cause of action in North Carolina.  Rather, liability for civil conspiracy must be alleged in conjunction with an underlying claim for unlawful conduct." *McCarron v. Howell*, 2024 NCBC LEXIS 144, at *17 (N.C. Super. Ct. Nov. 19, 2024) (cleaned up); *see also Toomer v. Garrett*, 155 N.C. App. 462, 483 (2002) (holding that "[o]nly where there is an underlying claim for unlawful conduct can a plaintiff state a claim for civil conspiracy by also alleging the agreement of two or more parties to carry out the conduct and injury resulting from that agreement").

166.    Because the Court has concluded herein that Highlights and HLRE have failed to state a claim for misappropriation of trade secrets, so too have they failed to state a claim for civil conspiracy. *See, e.g., S. Fastening Sys., Inc. v. Grabber Constr.*

*Prods., Inc.*, 2015 NCBC LEXIS 42, at *20 (N.C. Super. Ct. Apr. 28, 2015) (noting that "[i]f the underlying [claim] supporting a claim for conspiracy [is] dismissed, so too must the claim for conspiracy be dismissed[ ]").

167. Therefore, Defendants' Motion to Dismiss is **GRANTED**, and the claim by Highlights and HLRE for conspiracy to misappropriate trade secrets is **DISMISSED** with prejudice.

168. With respect to Empyrean, Defendants' only real argument in support of dismissal of the conspiracy claim is that the claim cannot survive once the accompanying predicate claim to which it is attached is subject to dismissal. But with regard to Empyrean, the Court has found that its claim for misappropriation of trade secrets survives Defendants' Motion to Dismiss.

169. Accordingly, the Court concludes that Defendants' Motion to Dismiss is **DENIED** with respect to Empyrean's claim for civil conspiracy to misappropriate trade secrets against Abell, Magee, O'Reilly, and Stanley.

**F.** **Tortious Interference with Contractual and Business Relationships**[11]

170. Our Supreme Court has articulated the following elements of a claim for tortious interference with existing contract:

---

[11] While our Court has previously recognized that a claim for tortious interference with business relations "embraces claims for both existing contracts and prospective future contracts[,]" *E-Ntech Independent Testing Services, Inc. v. Air Masters, Inc.*, 2017 NCBC LEXIS 2, at *14 (N.C. Super. Ct. Jan. 5, 2017) (cleaned up), at the 22 January hearing on the Motions, counsel for the Companies clarified that they have only intended to state a claim for tortious interference with *existing* contracts. (Hearing Tr., at 11.) Accordingly, the Court need not—and does not—address whether the allegations in the Amended Complaint are sufficient to state a claim for tortious interference with *prospective* contracts.

(1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff.

*United Lab'ys, Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988) (cleaned up).

171. In connection with this claim, the Companies have asserted two independent theories of liability. First, they allege that Abell and Magee tortiously interfered with the Companies' existing contracts with employees and vendors as part of Abell and Magee's scheme to establish a competing business. Second, the Companies contend that O'Reilly and Stanley tortiously interfered with the Companies' contracts with Abell and Magee—namely, the Restrictive Covenants—by inducing Abell and Magee to breach their non-competition, non-solicitation, and confidentiality agreements.

**(1) Abell and Magee**

172. With respect to Abell and Magee, the Companies contend that Abell and Magee engaged in tortious interference with contract by attempting to induce the Companies' employees and vendors to breach their existing agreements with the Companies as part of Abell and Magee's plan to establish a competing business.

173. With regard to this theory of liability, Defendants only challenge whether the Amended Complaint has alleged sufficient facts to support a conclusion that Abell and Magee acted without legal justification.

174. This Court has previously stated the following regarding the "without justification" element of a claim for tortious interference with existing contract:

"A motion to dismiss a claim of tortious interference is properly granted where the complaint shows the interference was justified[.]" *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 605 (2007) (citing *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 220 (1988)). "The interference is 'without justification' if the defendants' motives . . . were 'not reasonably related to the protection of a legitimate business interest' of the defendant." *Privette v. Univ. of N.C. at Chapel Hill*, 96 N.C. App. 124, 134 (1989) (quoting *Smith v. Ford Motor Co.*, 289 N.C. 71, 94 (1976)).

*Avadim Health, Inc. v. Harkey*, 2021 NCBC LEXIS 104, at *18 (N.C. Super. Ct. Nov. 30, 2021).

175. "[C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests *and by means that are lawful*." *Peoples Sec. Life Ins. Co.*, 322 N.C. at 221 (cleaned up and emphasis added). "This Court has made clear that a defendant-competitor cannot escape liability on a tortious interference claim by arguing that it acted with justification where the competitor competed through the use of unlawful means." *Miller v. Redgoose, L.L.C.*, 2024 NCBC LEXIS 148, at *16–17 (N.C. Super. Ct. Nov. 26, 2024) (cleaned up); *see also Mech. Sys. & Servs., Inc. v. Howard*, 2021 NCBC LEXIS 69, at *13 (N.C. Super. Ct. Aug. 11, 2021) (concluding that while "competition in business constitutes justifiable interference[,]" such a privilege is lost where "the [pleading] alleges that the means of competition used by [defendants] . . . were not lawful[ ]").

176. Here, the Companies have alleged that Abell and Magee's tortious interference with the Companies' contracts was undertaken in violation of the

confidentiality and non-solicitation provisions of the Restrictive Covenants.[12] Such circumstances—wherein an employee breaches a restrictive covenant in order to advance a competitive interest—have been found by this Court to be sufficient to satisfy the "without justification" element of a tortious interference claim. *See Implus Footcare, LLC v. Vore*, 2025 NCBC LEXIS 121, at *91 (N.C. Super. Ct. Sept. 11, 2025) (concluding that the complaint sufficiently alleged the interference was without justification based on allegations that the interference also "breached the [defendant's] [a]greement" with the plaintiff).

177. Therefore, Defendants' Motion to Dismiss the Companies' claim for tortious interference with contractual and business relationships against Abell and Magee is **DENIED**.

### (2) O'Reilly and Stanley

178. With respect to O'Reilly and Stanley, the Companies assert that O'Reilly and Stanley improperly encouraged and facilitated Abell and Magee's respective breaches of the Restrictive Covenants as part of their coordinated effort to misappropriate the Companies' confidential and trade secret information and to solicit the Companies' employees and vendors for their own competing business venture.

179. In seeking dismissal of this claim, Defendants make various arguments concerning the sufficiency of the Companies' allegations as to (1) whether O'Reilly

---

[12] Unlike the non-competition provision, Abell and Magee have not challenged the reasonableness of the scope of the non-solicitation and confidentiality provisions contained in the Restrictive Covenants. (*See generally* ECF No. 17.)

and Stanley had knowledge of the terms of the Restrictive Covenants; (2) whether O'Reilly and Stanley actively induced Abell and Magee to breach the terms of the Restrictive Covenants; and (3) whether O'Reilly and Stanley acted without legal justification. However, the Court only needs to address Defendants' first argument.

180. With respect to the "knowledge" element of a claim for tortious interference with contract, our Supreme Court has made clear that broad and conclusory allegations that the defendant "had knowledge and/or should have had knowledge of the existing contracts" at issue are insufficient. *Krawiec*, 370 N.C. at 607. Rather, the complaint must specifically allege *how* the defendant learned of the terms of the agreement. *Id.*

181. Here, the only allegation in the Amended Complaint concerning O'Reilly's and Stanley's purported knowledge of the Restrictive Covenants states that "[u]pon information and belief, O'Reilly[ ] and Stanley were made aware of Plaintiffs' contractual relationships with Abell and Magee[.]" (Am. Compl. ¶ 161.) Not only does this allegation fail to allege facts demonstrating *how* O'Reilly and Stanley obtained such knowledge but it also does not even specifically reference the Restrictive Covenants—as opposed to the various other contractual agreements that Abell and Magee entered into with the Companies.

182. As such, the allegations in the Amended Complaint are plainly insufficient to satisfy North Carolina's pleading requirements for claims of tortious interference with existing contract. *See Krawiec*, 370 N.C. at 606–07; *see also Salon Blu, Inc. v. Salon Lofts Grp., LLC*, 2018 NCBC LEXIS 72, at *12 (N.C. Super. Ct. July

16, 2018) ("Salon Blu does not allege any facts supporting the conclusion that Salon Lofts had knowledge of the Employment Agreements; in fact, Salon Blu merely alleges that Salon Lofts 'knew or should have known' about the Employment Agreements, an allegation that is far too vague to satisfy the pleading requirements under *Krawiec*.").

183.    Accordingly, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED** and the Companies' claim for tortious interference with contractual and business relationships against O'Reilly and Stanley should be **DISMISSED** without prejudice.[13]

### G.    Unauthorized Access to Computer Systems

184.    The Companies' claim for unauthorized access to computer systems is asserted solely against Abell.

185.    In support of this claim, the Companies have alleged that—following his termination—Abell used the laptop the Companies had provided him for the purpose of remotely accessing their computer systems, email addresses, shared drives, and internal platforms to obtain information in order to benefit his competing business.

186.    N.C.G.S. § 14-458(a) states, in relevant part, as follows:

> Except as otherwise made unlawful by this Article, it shall be unlawful for any person to use a computer or computer network without authority and with the intent to do any of the following:

---

[13] "The decision to dismiss an action with or without prejudice is in the discretion of the trial court[.]" *First Fed. Bank v. Aldridge*, 230 N.C. App. 187, 191 (2013) (cleaned up).

(1) Temporarily or permanently remove, halt, or otherwise disable any computer data, computer programs, or computer software from a computer or computer network.

(2) Cause a computer to malfunction, regardless of how long the malfunction persists.

(3) Alter or erase any computer data, computer programs, or computer software.

(4) Cause physical injury to the property of another.

(5) Make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs, or computer software residing in, communicated by, or produced by a computer or computer network.

(6) Falsely identify with the intent to deceive or defraud the recipient or forge commercial electronic mail transmission information or other routing information in any manner in connection with the transmission of unsolicited bulk commercial electronic mail through or into the computer network of an electronic mail service provider or its subscribers.

N.C.G.S. § 14-458(a).

187.    For purposes of N.C.G.S. § 14-458(a), the phrase "without authority" means, *inter alia*, "when . . . the person has no right of permission of the owner to use a computer, or the person uses a computer in a manner exceeding the right or permission[.]" *Id.*

188.    In support of their Motion to Dismiss, Defendants contend that the Companies' claim for unauthorized access to computer systems fails because the Amended Complaint does not allege that Abell acted with the *intent* to commit any of the six above-quoted enumerated acts in N.C.G.S. § 14-458(a). The Court, however, rejects this argument.

189. While the allegations in the Amended Complaint as to this issue are once again less than a model of clarity, taking the allegations as true and construing them in the light most favorable to the Companies, the Amended Complaint alleges that Abell accessed the Companies' computer systems—without authorization—for the purpose of obtaining information, which he has subsequently used in an effort to establish a competing business.

190. The Court is satisfied that these allegations are sufficient at the pleadings stage to allege that Abell acted with the requisite intent to alter, make a copy, or cause a copy of the Companies' computer data to be made. *See MarketPlace 4 Ins., LLC v. Vaughn*, 2023 NCBC LEXIS 31, at *31–32 (N.C. Super. Ct. Feb. 24, 2023) (denying a motion to dismiss where the complaint was "replete with allegations of intentional acts by [the defendant] as part of a scheme on his part to use [the plaintiff's] computer systems in order to gain unauthorized access to customer information for the purpose of obtaining additional clients" for a competing business).

191. Therefore, Defendants' Motion to Dismiss the Companies' claim for unauthorized access to computer systems against Abell is **DENIED**.

H. **Forgery/Fraudulent Inducement**[14]

192. In support of their claim for fraudulent inducement, the Companies allege that Abell caused various promissory notes to be "issued" by Highlights—

---

[14] At the 22 January hearing on the Motion, counsel for the Companies conceded that "forgery" is not a recognized civil cause of action under North Carolina law and that the claim being asserted is solely for fraudulent inducement. (Hearing Tr., at 61.)

without authorization—including: a $400,000 note payable to himself; a $121,000 note payable to himself; and a $2,392,791.84 note payable to himself and Cher Abell.

193. It appears to be undisputed that none of these promissory notes were ever presented for payment to Highlights, that Highlights never paid out any money whatsoever in connection with them, and that Highlights was unaware of their existence until after Abell had been terminated.

194. Though the Amended Complaint captions this claim as being brought by "Plaintiffs," at the 22 January hearing on the Motions, counsel for the Companies clarified that the claim is being asserted solely by Highlights. (Hearing Tr., at 61.) Accordingly, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED**, and Empyrean and HLRE's claim for "forgery/fraudulent inducement" against Abell, Magee, and Cher Abell should be **DISMISSED** with prejudice.

195. Our Supreme Court has held that the elements of claims for fraud and fraudulent inducement are identical. *Value Health Sols., Inc. v. Pharm. Rsch. Assocs.*, 385 N.C. 250, 264 (2023). To state a valid claim for fraud, a plaintiff must allege "(1) [a] false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ward v. Fogel*, 237 N.C. App. 570, 581 (2014), *disc. rev. denied*, 368 N.C. 249 (2015).

196. "Claims of fraud are held to a heightened pleading standard pursuant to Rule 9(b) of the North Carolina Rules of Civil Procedure." *Julian v. Wells Fargo Bank, N.A.*, 2012 NCBC LEXIS 32, at *19 (N.C. Super. Ct. May 22, 2012) (cleaned

up). The particularity requirement of Rule 9(b) "is met by alleging [the] time, place and content of the fraudulent representation, [the] identity of the person making the representation and what was obtained as a result of the fraudulent acts or representations." *Terry v. Terry*, 302 N.C. 77, 85 (1981). "An alleged misrepresentation must be 'definite and specific.'" *Value Health Sols., Inc.*, 385 N.C. at 263.

197. In support of their Motion to Dismiss, Defendants assert that the Amended Complaint fails to allege that the Companies reasonably relied on the allegedly fraudulent promissory notes because the Companies have not alleged that any payments were actually made to Abell or Cher Abell in connection with the notes. The Court agrees.

198. Under the heightened pleading standard for claims of fraud and fraudulent inducement, a party's reliance on the fraudulent representation must be pled with particularity and identify "a[ ] specific opportunity" that was lost as a result. *Deluca v. River Bluff Holdings II, LLC*, 2015 NCBC LEXIS 12, at *23 (N.C. Super. Ct. Jan. 28, 2015) (cleaned up); *see also Brown v. Secor*, 2020 NCBC LEXIS 134, at *14 (N.C. Super. Ct. Nov. 13, 2020) (noting that to plead reliance, the claimant must allege that they "acted or refrained from acting in a certain manner" as a result of the fraudulent conduct).

199. Here, the Amended Complaint's conclusory allegation that the Companies "reasonably relied on the authenticity" of the fraudulent promissory notes is insufficient to state a claim for relief. *See Deluca*, 2015 NCBC LEXIS 12, at *22–

23 (dismissing a claim for fraud when "[p]laintiffs . . . fail[ed] to point to evidence of any specific opportunity to [ ] sell that they forewent" as a result of the fraudulent conduct).

200. Accordingly, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED**, and Highlights's claim for "forgery/fraudulent inducement" against Abell, Magee, and Cher Abell should be **DISMISSED** with prejudice.

## I.    UDTP

201. "To prevail on a claim of unfair and deceptive trade practice[s] a plaintiff must show (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." *Spartan Leasing Inc. v. Pollard*, 101 N.C. App. 450, 460 (1991) (cleaned up).

202. In the Amended Complaint, the Companies contend that each of the Defendants have engaged in unfair and deceptive trade practices through their misappropriation of the Companies' trade secrets and tortious interference with the Companies' contracts.

203. First, with respect to Abell and Magee, "our courts have long recognized that claims for misappropriation of trade secrets and tortious interference with contract may form the basis of a UDTP claim[.]" *S. Fastening Sys., Inc.*, 2015 NCBC LEXIS 42, at *28 (cleaned up); *see also Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *30 (holding that validly pled claims for misappropriation of trade secrets and tortious interference with contract also "allege sufficient facts for [a] UDTP claim to survive").

204. Because the Court has concluded herein that the Companies have stated a valid claim for tortious interference with contract against Abell and Magee and that Empyrean has stated a valid claim for misappropriation of trade secrets against Abell, so too have the Companies stated a valid claim for UDTP against Abell and Magee. *See Jekson USA, Inc. v. White*, 2026 NCBC LEXIS 54, at *24 (N.C. Super. Ct. Mar. 4, 2026) ("Although White argues that Jekson has failed to plead a valid claim for UDTP, the Court has allowed Jekson's claim[ ] for misappropriation of trade secrets . . . to go forward. Under North Carolina case law, th[is] claim[ ] [is] sufficient to serve as [a] predicate[ ] for a UDTP claim."); *Greentouch USA, Inc. v. Lowe's Cos., Inc.*, 2024 NCBC LEXIS 132, at *26–27 (N.C. Super. Ct. Oct. 2, 2024) (holding that "the continued viability of [plaintiff's] tortious interference claims—without more— is sufficient to allow [plaintiff] to proceed on a UDTP claim[ ]").

205. Therefore, Defendants' Motion to Dismiss the Companies' UDTP claim against Abell and Magee is **DENIED**.

206. Second, with respect to O'Reilly and Stanley, the Court has concluded above that Defendants' Motion to Dismiss the Companies' claims for misappropriation of trade secrets and tortious interference with business relationships should be granted with respect to O'Reilly and Stanley, and those claims are herein dismissed.

207. Nonetheless, the Court is satisfied that the allegations in the Amended Complaint concerning O'Reilly's and Stanley's participation in a civil conspiracy along with Abell (as discussed above) is sufficient to state a claim for UDTP. *See CRH*

*E., LLC v. Berastain*, 2025 NCBC LEXIS 11, at *42 (N.C. Super. Ct. Feb. 4, 2025) (denying a motion to dismiss a UDTP claim based on the defendants' "alleged participation in a conspiracy to unlawfully compete" with the plaintiff); *Sandhills Home Care, L.L.C. v. Companion Home Care - Unimed, Inc.*, 2016 NCBC LEXIS 61, at *50 (N.C. Super. Ct. Aug. 1, 2016) (concluding that allegations that the defendants "secretly conspired . . . to solicit and entice [p]laintiff's employees to work for, and bring their patients to," the defendants' employer was sufficient to allege "unfair and deceptive behavior that offends public policy[ ]").

208.    Therefore, Defendants' Motion to Dismiss the Companies' claim for UDTP against O'Reilly and Stanley is **DENIED**.

209.    Finally, with respect to Cher Abell, the Court has now dismissed all of the claims asserted against her.  As such, the Amended Complaint has failed to state an underlying predicate claim to support its UDTP claim against her.  *See Charah, LLC v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 52, at *19 (N.C. Super. Ct. Apr. 17, 2020) ("North Carolina courts have previously concluded that when the UDTP claim rests solely upon other claims . . .  which the court determines should be dismissed, the UDTP claim must fail as well.").

210.    Accordingly, because the predicate claims for tortious interference and misappropriation of trade secrets were the bases offered by the Companies for rendering her liable for UDTP, the Court concludes that Defendants' Motion to Dismiss should be **GRANTED**, and the UDTP claim against Cher Abell should be **DISMISSED** with prejudice.

## II.    The Companies' Motion to Dismiss

211.    In the Companies' Motion to Dismiss, they have not sought dismissal of Abell and Magee's counterclaims for (1) breach of contract; (2) breach of information rights and accounting pursuant to N.C.G.S. § 57D-3-04 and Del. Code Ann. tit. 6, § 18-305; and (3) declaratory relief.

212.    Rather, the Companies have only moved to dismiss Abell and Magee's counterclaims for: (1) breach of the implied covenant of good faith and fair dealing; (2) UDTP; and (3) judicial dissolution.

213.    The Court will address the parties' arguments with respect to each of these claims in turn.

### A.    Breach of the Implied Covenant of Good Faith and Fair Dealing

214.    In their Counterclaims, Abell and Magee contend that the Companies have breached the implied covenant of good faith and fair dealing inherent in their respective operating agreements by (1) breaching their express terms relating to indemnification and advancement; and (2) attempting to frustrate Abell and Magee's expectations that their investments in the Companies would be rewarded upon the sale of their respective ownership interests.

215.    At the 22 January hearing on the Motions, counsel for Abell and Magee conceded that—pursuant to the choice-of-law provision contained in each of the Companies' respective operating agreements—Delaware law governs the claim to the extent that it is asserted against Highlights and Empyrean, and North Carolina law

governs the claim to the extent that it is asserted against HLRE. (Hearing Tr., at 118–19.)

216. Therefore, the Court will first address Abell and Magee's claim under Delaware law asserted against Highlights and Empyrean before turning to the claim against HLRE under North Carolina law.

### (1) Highlights and Empyrean

217. Under Delaware law, "[t]o successfully plead an implied covenant claim, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 3118 A.3d 450, 468 (Del. Ch. 2024) (cleaned up).

218. Our Supreme Court has recently summarized the operation of the implied covenant of good faith and fair dealing under Delaware law as follows:

> Under Delaware law, courts "interpret contracts as a whole," "will give each provision and term effect, so as not to render any part of the contract mere surplusage," and "will not read a contract to render a provision or term meaningless or illusory." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d 39, 56 (Del. 2019) (quoting *Osborn ex rel. Estate of Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)[)]. "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions." *In re Shorenstein Hays-Nederlander Theatres LLC Appeals*, 213 A.3d at 56–57 (quoting *Osborn*, 991 A.2d at 1159–60). It is true that under Delaware law the implied covenant of good faith and fair dealing "inheres in every contract," *Chamison v. HealthTrust, Inc.—The Hospital Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), and may be used to imply terms for "developments that could not be anticipated[,]" *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010). However, the covenant of good faith and fair dealing "is not an equitable remedy for rebalancing economic interests after events that could have been anticipated." *Nemec*, 991 A.2d at 1128. Indeed, the covenant of good faith and fair

dealing should not be applied "to give the plaintiffs contractual protections that 'they failed to secure for themselves at the bargaining table.' " *Winshall v. Viacom Int'l Inc.*, 76 A.3d 808, 816 (Del. 2013) (quoting *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1260 (Del. 2004)[)].

*Value Health Sols., Inc.*, 385 N.C. at 267–68.

219. Neither in their Counterclaims nor in their brief in response to the Companies' Motion have Abell and Magee specifically identified a contractual "gap" for the implied covenant of good faith and fair dealing to fill. Nor have they alleged the occurrence of any events that were unforeseeable at the time Highlights and Empyrean's respective operating agreements were executed.

220. To the contrary, a careful reading of Highlights and Empyrean's respective operating agreements reveals that the parties specifically bargained for the various rights and obligations of its members and the circumstances in which a member's interests in the companies could be terminated. (*See generally* Am. Compl. Ex. A; Am. Compl. Ex. D; Am. Compl. Ex. E.)

221. As such, Abell and Magee cannot now invoke the implied covenant of good faith and fair dealing to demand the judicial recognition of rights that are not expressly provided for in Highlights and Empyrean's respective operating agreements. *See Blaustein v. Lord Balt. Cap. Corp.*, 84 A.3d 954, 959 (Del. 2014) (holding that the implied covenant of good faith and fair dealing was inapplicable where "the parties did consider whether, and on what terms, minority stockholders would be able to have their stock repurchased[ ]"); *Red Cat Holdings, Inc. v. Autonodyne LLC*, 2024 Del. Ch. LEXIS 19, at *27 (Del. Ch. Jan. 30, 2024) (concluding that where "express terms" are saliant to the dispute, it "would not be the

unanticipated and silent circumstances suitable for the implied covenant's application[ ]").

222. Accordingly, the Court concludes that the Companies' Motion to Dismiss should be **GRANTED**, and Abell and Magee's counterclaim for breach of the implied covenant of good faith and fair dealing should be **DISMISSED** with prejudice as it relates to Highlights and Empyrean.

### (2) HLRE

223. Under North Carolina law, all contracts contain an implied covenant of good faith and fair dealing that places a duty on the parties to "act in good faith and to make reasonable efforts to perform [their] obligations under the agreement." *Maglione v. Aegis Fam. Health Ctrs.*, 168 N.C. App. 49, 56 (2005) (cleaned up). "To state a valid claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must plead that the party charged took action which injured the right of the other to receive the benefits of the agreement, thus depriving the other of the fruits of the bargain." *Conleys Creek Ltd. P'ship v. Smoky Mountain Country Club Prop. Owners Ass'n, Inc.*, 255 N.C. App. 236, 253 (2017) (cleaned up).

224. In support of the Companies' Motion to Dismiss, they make various arguments as to why Abell and Magee's claim for breach of the implied covenant of good faith and fair dealing should be dismissed with respect to HLRE. However, the Court need not address those arguments.

225. It is well recognized that " 'where a party's claim for breach of the implied covenant of good faith and fair dealing is based upon the same acts as its

claim for breach of contract, we treat the former claim as part and parcel of the latter,' so that the two rise and fall together." *Vill. at Motts Landing Homeowners' Ass'n v. Aftew*, 2023 NCBC LEXIS 100, at *13 (N.C. Super. Ct. Aug. 14, 2023) (quoting *Cordaro v. Harrington Bank, FSB*, 260 N.C. App. 26, 38–39 (2018)).

226. Here, because Abell and Magee's claim for breach of the implied covenant of good faith and fair dealing against HLRE is based, at least in part, on their claim for breach of contract against HLRE—a claim which the Companies have not challenged under Rule 12(b)(6)—Abell and Magee have stated a valid claim for relief. *See Se. Anesthesiology Consultants, PLLC v. Rose*, 2019 NCBC LEXIS 52, at *23–24 (N.C. Super. Ct. Aug. 20, 2019) (denying a motion to dismiss a claim for breach of the implied covenant of good faith and fair dealing based on a validly pled claim for breach of contract); *see also Innovare, Ltd. v. Sciteck Diagnostics, Inc.*, 2023 NCBC LEXIS 8, at *30 (N.C. Super. Ct. Jan. 19, 2023) (noting that "[w]here a breach of contract claim survives dismissal, we have previously declined to dismiss a claim for breach of the implied covenant of good faith and fair dealing[ ]" when the allegations in support of both "overlap[ ]").

227. Therefore, the Companies' Motion to Dismiss Abell and Magee's claim for breach of the implied covenant of good faith and fair dealing against HLRE is **DENIED**.

B. UDTP

228. The sole basis asserted in the Counterclaims for holding the Companies liable for UDTP concerns the circumstances under which Abell and Magee were

terminated by Graham—allegedly as part of a pretext to create a "triggering event" that would allow him to take control of Abell and Magee's respective interests in the Companies.

229. In support of their Motion to Dismiss the UDTP claim, the Companies contend that their alleged conduct (1) was not "in or affecting" commerce; and (2) was not accompanied by substantial aggravating circumstances.

230. First, with respect to the "in or affecting commerce" element of a UDTP claim, commerce "includes all business activities, however denominated[.]" N.C.G.S. § 75-1.1(b). North Carolina courts have broadly defined "business activity" as the "regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 594 (1991).

231. However, while the "in or affecting commerce" element of a UDTP claim is broad, it does not encompass "all wrongs" involving a business. *Sterner v. Penn*, 159 N.C. App. 626, 633 (2003). "Certain events . . . are deemed to be extraordinary events outside of the regular, day-to-day activities or affairs of a business. Such extraordinary events are, therefore, not deemed 'business activities' and are not 'in or affecting commerce.'" *DeGorter v. Capitol Bancorp Ltd.*, 2011 NCBC LEXIS 29, at *10 (N.C. Super. Ct. July 29, 2011) (cleaned up).

232. To the extent Abell and Magee's UDTP theory is framed as a dispute in the employment context, it is well recognized that "pure employer-employee disputes are not sufficiently 'in or affecting commerce' to satisfy the second element of a

UDTP[ ] claim." *Gress v. Rowboat Co., Inc.*, 190 N.C. App. 773, 777 (2008) (cleaned up). As such, "most employer-employee disputes fall outside the purview" of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). *Value Health Sols., Inc.*, 385 N.C. at 277 (cleaned up); *see Kadah v. Paladin Drones, Inc.*, 2026 NCBC LEXIS 111, at *11–13 (N.C. Super. Ct. May 11, 2026) (concluding that an employer "misrepresenting its intention to pay the [b]onus, misrepresenting its intention to honor [contractual agreements], using false promises to secure [p]laintiff's continued performance, and tendering coercive release documents[ ]" was not "in or affecting commerce" for purposes of the UDTPA); *Maurer v. SlickEdit, Inc.*, 2005 NCBC LEXIS 2, at *18–19 (N.C. Super. Ct. May 16, 2005) (dismissing a UDTP claim because the defendant "firing plaintiff from her position of CEO[;] . . . failing to honor [its] commitment[s]; [and] . . . denying plaintiff meaningful participation on the [b]oard" were not actions in or affecting commerce).

233. To the extent Abell and Magee's UDTP theory is more properly framed as a dispute between the members of a limited liability company, our Supreme Court has recognized that the UDTPA "is not focused on the internal conduct of individuals within a single market participant, that is, within a single business." *White v. Thompson*, 364 N.C. 47, 53 (2010) (cleaned up).

234. Here, the issue of whether the Companies—through Graham— wrongfully acted as part of a pretextual scheme to usurp Abell and Magee's respective ownership and management interests in each of the Companies is not "in or affecting commerce" because such a dispute purely concerns the internal management of the

Companies and the parties' respective rights and obligations as members and managers under the Companies' respective operating agreements. *See Poluka v. Willette*, 2021 NCBC LEXIS 105, at *17–18 (N.C. Super. Ct. Dec. 2, 2021) (dismissing a claim for UDTP because allegations that the defendant "abused his position as a member of [the company] to the detriment of the LLC and for [defendant's] own personal benefit[ ]" reflected "an internal dispute[ ]" and not conduct "in or affecting commerce"); *LLG-NRMH, LLC v. N. Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *9 (N.C. Super. Ct. Oct. 9, 2018) (concluding that the defendants' "failure to properly capitalize the companies," "wrongful demand to reorganize them," and "interference with the[ir] management" were matters "internal" to the companies and not "in or affecting commerce").

235. Accordingly, the Court concludes that the Companies' Motion to Dismiss should be **GRANTED**, and Abell and Magee's counterclaim for UDTP should be **DISMISSED** with prejudice.

## C.    Judicial Dissolution

236. In addition to their claims for monetary relief, Abell and Magee have petitioned the Court for a decree of judicial dissolution solely as it relates to HLRE. Specifically, Abell and Magee contend that the judicial dissolution of HLRE is proper under N.C.G.S. § 57D-6-02 and pursuant to our Supreme Court's holding in *Meiselman v. Meiselman*, 309 N.C. 279 (1983).

### (1) N.C.G.S. § 57D-6-02

237. Under N.C.G.S. § 57D-6-02, a member of a limited liability company may petition the trial court for dissolution "if it is established that (i) it is not practicable to conduct the LLC's business in conformance with the operating agreement and this Chapter or (ii) liquidation of the LLC is necessary to protect the rights and interests of the member." N.C.G.S. § 57D-6-02(2). "[T]he first prong is conjunctive, requiring the member to show impracticability under both the operating agreement and Chapter 57D to permit dissolution[.]" *Norris v. Greymont Dev., LLC*, 2022 NCBC LEXIS 7, at *8 (N.C. Super. Ct. Jan. 31, 2022).

238. Our Supreme Court has recently articulated the relevant factors that a trial court should consider in assessing whether the management of an LLC is impracticable:

> (1) whether the management of the company is unable or unwilling to work together to reasonably engage in or promote the purpose for which the company was formed; (2) whether there is deadlock between the managers; (3) whether the operating agreement provides a means of navigating around such deadlock; (4) whether, due to the company's financial position, there is still a business to operate; (5) whether continuing the company is financially feasible; and (6) whether a member or manager has engaged in misconduct.

*James H.Q. Davis Tr. v. JHD Props., LLC*, 387 N.C. 19, 29 (2025) (footnote omitted).

239. Based on the allegations in the Counterclaims, while it is conceded that HLRE is continuing to conduct business, Abell and Magee contend that (1) Graham is unwilling to work with them to promote the purpose for which HLRE was formed; (2) Graham refuses to recognize their ongoing ownership interests in HLRE; and (3)

Graham has engaged in various forms of financial misconduct. (*See* Countercls. ¶¶ 103–05, 120–24.)

240. Such allegations are sufficient—at least at the Rule 12 stage—to state a claim for judicial dissolution pursuant to N.C.G.S. § 57D-6-02. *See Bourgeois v. Lapelusa*, 2022 NCBC LEXIS 111, at *17 (N.C. Super. Ct. Sept. 23, 2022) (denying a motion to dismiss a claim for judicial dissolution and concluding that plaintiffs' "allegations of misconduct, if true, could support judicial dissolution of the entity to protect [plaintiffs'] interest and that, under the circumstances, it would be premature to dismiss th[e] claim[ ]"); *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC LEXIS 39, at *24 (N.C. Super. Ct. June 19, 2019) ("Nova Trading has alleged that Pai Lung breached its fiduciary duty as part of a scheme to take exclusive control of Vanguard. If true, these improprieties could support a claim that dissolution is necessary to protect Nova Trading's interests."); *see also Dunn Holdings I, Inc. v. Confluent Health LLC*, 2018 NCBC LEXIS 89, at *31–32 (N.C. Super. Ct. Aug. 24, 2018) (noting that the ongoing nature of the "parties' disputes and their current relationship[ ]" suggested that judicial dissolution may be "necessary to protect [the plaintiff's] interests[ ]").

241. Therefore, the Companies' Motion to Dismiss Abell and Magee's claim for judicial dissolution against HLRE pursuant to N.C.G.S. § 57D-6-02 is **DENIED**.

### (2) *Meiselman* Claim

242. In order to state a claim for judicial dissolution under our Supreme Court's holding in *Meiselman*, the claimant must allege "(1) a reasonable expectation

known to or assumed by the majority; (2) frustration of that expectation; (3) that the frustration occurred through no fault of the plaintiff and was largely beyond the plaintiff's control; and (4) that, under all the circumstances, judicial dissolution is warranted and reasonably necessary to protect the [plaintiff's] interests." *Mauck v. Cherry Oil Co.*, 388 N.C. 325, 334 (2025) (cleaned up).

243.   With respect to the applicability of *Meiselman* to claims for judicial dissolution of a limited liability company, this Court has previously observed:

> "[O]ur courts have not yet decided whether and to what extent the principles of *Meiselman* apply to actions" to dissolve an LLC. *Bennett v. Bennett*, 2019 NCBC LEXIS 19, at *35 (N.C. Super. Ct. Mar. 15, 2019); *see also Pure Body Studios Charlotte, LLC v. Crnalic*, 2017 NCBC LEXIS 98, at *13 (N.C. Super. Ct. Oct. 18, 2017); *Brady v. Van Vlaanderen*, 2017 NCBC LEXIS 61, at *31–32 (N.C. Super. Ct. July 19, 2017).  Such questions should be addressed on a more fully developed record.  Particularly given that the section 57D-6-02(2) claim is moving forward, it would be premature to dismiss the *Meiselman* claim.
>
> Finally, it bears noting that it is not clear whether an LLC member may bring a freestanding *Meiselman* claim, as Nova Trading has here.  There is a reasonable argument that the legislature intended section 57D-6-02(2) to be the exclusive avenue for LLC members to seek judicial dissolution, though the application of section 57D-6-02(2) may be informed by *Meiselman* principles.

*Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, at *24–25.

244.   In any event, because the Court has concluded that the Companies' Motion to Dismiss should be denied with respect to Abell and Magee's counterclaim for judicial dissolution under N.C.G.S. § 57D-6-02, the Court need not separately determine whether Abell and Magee have stated a claim for judicial dissolution of HLRE pursuant to *Meiselman.  See Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, at *24.

245. Therefore, the Companies' Motion to Dismiss Abell and Magee's counterclaim for judicial dissolution of HLRE pursuant to *Meiselman* is **DENIED**.

### III. Third-Party Defendants' Motion to Dismiss

246. In their Motion to Dismiss, Third-Party Defendants request that the Court dismiss each of the claims asserted in the Third-Party Complaint—namely, (1) Abell and Magee's individual claim for breach of fiduciary duty; (2) Abell and Magee's individual claim for constructive fraud; (3) Abell and Magee's derivative claim (asserted on behalf of Highlights and Empyrean) for breach of fiduciary duty; and (4) Abell and Magee's derivative claim (asserted on behalf of Highlights and Empyrean) for corporate waste and self-dealing. Third-Party Defendants also seek dismissal of Abell and Magee's "claim" seeking to pierce the corporate veil with respect to Knox Hill.

247. As an initial matter, Abell and Magee assert that the Court should summarily deny the Third-Party Defendants' Motion as untimely because it was filed on 22 September 2025 at 5:05 p.m.—five minutes past the filing deadline set out in Business Court Rule 3.6. *See* BCR 3.6 ("If a document is due on a date certain, then the document must be filed by 5:00 p.m. Eastern Time on that date, unless the Court orders otherwise.").

248. Third-Party Plaintiffs do not assert that they have been prejudiced in any way by the slight delay.

249. The Court, in the exercise of its discretion and through its inherent authority to manage its docket, **ORDERS** that Third-Party Defendants' Motion (and

accompanying brief) be deemed timely. *See, e.g., Raper ex rel. Estate of Raper v. Oliver House, LLC*, 180 N.C. App. 414, 418 (2006) (finding that the "trial court did not abuse its discretion" in accepting late-filed documents).

250. Turning to the merits of Third-Party Defendants' Motion to Dismiss, the Court will first address Abell and Magee's individual claims for breach of fiduciary duty and constructive fraud and then consider their derivative claims for breach of fiduciary duty and corporate waste/self-dealing asserted on behalf of Highlights and Empyrean.

### A.      Individual Claims

251. With respect to their individual claims for relief, Abell and Magee have asserted claims for breach of fiduciary duty and constructive fraud against Graham and Knox Hill in connection with their respective ownership and management of each of the Companies.

252. As an initial matter, the parties dispute which state's substantive law applies to these claims. While Abell and Magee contend that these claims are governed exclusively by North Carolina law—pursuant to the application of the *lex loci* test—Third-Party Defendants assert that the internal corporate affairs doctrine requires (1) the application of Delaware law to claims concerning the management and membership of Highlights and Empyrean; and (2) the application of North Carolina law to claims concerning the management and membership of HLRE. The Court agrees with Third-Party Defendants on this issue.

253.   Abell and Magee are correct that the *lex loci* test for claims of breach of fiduciary duty and constructive fraud typically directs the application of the state's substantive law where the legal injury occurred.  *See, e.g., Nelson v. All. Hosp. Mgmt., LLC*, 2013 NCBC LEXIS 39, at *25 (N.C. Super. Ct. Aug. 20, 2013) (noting that because claims for "breach of fiduciary duty and constructive fraud . . . sound in tort[,]" they are typically governed by the *lex loci* test).

254.   However, North Carolina subscribes to the internal affairs doctrine which effectively functions as an exception to the *lex loci* test and which our Court of Appeals has described as follows:

> The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands.

*Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 680 (2008) (cleaned up).

255.   This Court has consistently held that the internal affairs doctrine applies equally to claims concerning the internal governance and management of limited liability companies.  *See Barings LLC*, 2025 NCBC LEXIS 18, at *21 ("Because Barings is a Delaware LLC, these claims are governed by Delaware law under the internal affairs doctrine."); *JS Real Est. Invs. LLC v. Gee Real Est., LLC*, 2017 NCBC LEXIS 104, at *15 (N.C. Super. Ct. Nov. 9, 2017) (applying Delaware law to claims "which concern[ed] the relationships between the members and managers of two Delaware LLCs[ ]" consistent with the "internal affairs doctrine[ ]").

256. Examples of disputes that North Carolina courts have held as "fall[ing] squarely within the internal affairs" doctrine's ambit include the "selection of directors and officers, adoption of by-laws, issuance of shares, holding of director and shareholder meetings, methods of and requirements for voting, and similar issues relating to the internal organization of the corporation or LLC." *Davis v. Davis*, 2014 NCBC LEXIS 60, at *10 (N.C. Super. Ct. Nov. 21, 2014) (cleaned up); *see also Hughes v. JBS Ventures, LLC*, 2026 NCBC LEXIS 37, at *23 n.59 (N.C. Super. Ct. Feb. 9, 2026) (noting that "[u]nder the internal affairs doctrine, claims for breach of fiduciary duty and constructive fraud are generally governed by the law of the state of incorporation[ ]").

257. Because Abell and Magee's claims for breach of fiduciary duty are predicated on the standard of conduct applicable to the Companies' members and managers, the substantive laws of the state in which each of the Companies is organized are applicable. *See, e.g., Healthcare Found. of Wilson v. DLP Healthcare, LLC*, 2026 NCBC LEXIS 131, at *16 (N.C. Super. Ct. June 23, 2026) ("Because Wilson Holding is a Delaware company, Delaware law governs its internal affairs, including the fiduciary obligations of its manager.").

258. Accordingly, to the extent Abell and Magee's individual claims for breach of fiduciary duty and constructive fraud are predicated on Third-Party Defendants' status as members or managers of Highlights or Empyrean—both of which are organized under Delaware law—Delaware law governs the claims. Likewise, to the extent that the individual claims for breach of fiduciary duty and

constructive fraud are predicated on Third-Party Defendants' status as members or managers of HLRE—a company organized under North Carolina law—North Carolina law will govern the claims.

### (1)    Breach of Fiduciary Duty

259.    In support of Abell and Magee's individual claims for breach of fiduciary duty, the Third-Party Complaint alleges that Graham—individually and through Knox Hill—has exercised his majority ownership interests in each of the Companies by acting as the Companies' sole manager.  As a result, Abell and Magee contend that Graham has (1) wrongfully terminated their employment; (2) usurped their ownership and managerial rights without any compensation; and (3) directed the Companies to breach the terms of their respective operating agreements by refusing Abell and Magee's demands for advancement and indemnification.

### (a)    Highlights

260.    With respect to Highlights, Knox Hill and Graham contend that they cannot be held liable for breach of fiduciary duty because Highlights's Operating Agreement waives any fiduciary duties they may have owed to Abell and Magee.

261.    Under Delaware law,"[t]o the extent that . . . a member or manager or other person has duties (including fiduciary duties) to a limited liability company or to another member or manager or to another person that is a party to or is otherwise bound by a limited liability company agreement, the member's or manager's or other person's duties may be expanded or restricted or eliminated by provisions in the limited liability company agreement[.]"  Del. Code Ann. tit. 6, § 18-1101(c); *see also*

*Miller v. HCP & Co.*, 2018 Del. Ch. LEXIS 40, at *21 (Del. Ch. Feb. 1, 2018) ("The Delaware Limited Liability Company Act permits parties to an LLC agreement to eliminate fiduciary duties that members or managers would otherwise owe to one another.").

262. In support of Third-Party Defendants' assertion that Highlights's Operating Agreement waives all fiduciary duties owed by the company's members and managers, they rely on the following portions of Section 5.5(c):

> <u>Limitation of Duties; Conflict of Interest</u>. To the maximum extent permitted by applicable law, *the LLC and each Unitholder hereby waives any claim or cause of action against each Manager and each Unitholder* (other than claims or causes of action against any Executive Manager in his or her capacity as an officer, employee or service-provider of the LLC or any of its Subsidiaries) *and their respective Affiliates, employees, agents and representatives for any breach of any fiduciary duty to the LLC or its Unitholders or any of the LLC's Subsidiaries* by any such Person, including as may result from any conflict of interest, *including a conflict of interest between the LLC or its Unitholders or any of the LLC's Subsidiaries and such Person or otherwise or breach of loyalty or any breach of the duty of care.* Each Unitholder acknowledges and agrees that in the event of any such conflict of interest, each such Person may act in the best interest of such Person or its Affiliates, employees, agents and representatives. No Manager or Unitholder (other than any Executive Manager in his or her capacity as an officer, employee or service provider of the LLC or any of its Subsidiaries) shall be obligated to give any consideration to any interest of or factors affecting the LLC or any of its Subsidiaries or the LLC's Unitholders, or to recommend or take any action in its capacity as a Manager or Unitholder that prefers the interests of the LLC or any of its Subsidiaries or the LLC's Unitholders over the interests of such Person or its Affiliates, employees, agents or representatives, and each of the LLC and each Unitholder hereby waives the fiduciary duty, if any, of such Person to Holdings LLC or its Unitholders, including in the event of any such conflict of interest or otherwise.

(Am. Compl. Ex. A, at 39 (emphasis added).)

263. In response, Abell and Magee contend that the following language from Section 7.1 of Highlights's Operating Agreement limits the scope of the waiver in Section 5.5(c):

> Exculpation. No Officer or Manager shall be liable to any other Officer, Manager, the LLC or to any Unitholder for any loss suffered by the LLC or any Unitholder *unless such loss is caused by such Person's fraud, willful misconduct or intentional and material breach of this Agreement.* The Officers and Managers shall not be liable for errors in judgment or for any acts or omissions that do not constitute fraud, willful misconduct or intentional and material breach of this Agreement. Any Officer or Manager may consult with counsel and accountants in respect of LLC affairs, and provided such Person acts in good faith reliance upon the advice or opinion of such counsel or accountants, such Person shall not be liable for any loss suffered by the LLC or any Unitholder in reliance thereon.

(Am. Compl. Ex. A, at 44 (emphasis added).)

264. Based on Section 7.1, Abell and Magee contend that they are permitted to bring claims against Third-Party Defendants for breach of fiduciary duty based on Graham and Knox Hill's fraud, willful misconduct, and intentional and material breaches of Highlights's Operating Agreement.

265. After carefully reviewing the language of Highlights's Operating Agreement and the arguments of the parties, the Court is unable to conclude at the present pleadings stage that the Operating Agreement bars these claims. *See Calumet Cap. Partners LLC v. Victory Park Cap. Advisors, LLC*, 353 A.3d 88, 112 (Del. Ch. 2026) (denying a motion to dismiss a claim for breach of fiduciary duty because "the [p]reserving [l]anguage create[d] a contractual obligation not to engage in 'fraud or willful misconduct[ ]' "); *In re Simplexity, LLC*, 2017 Bankr. LEXIS 1506, at *6–7 (Bankr. D. Del. June 1, 2017) (denying a motion to dismiss claims for breach

of fiduciary duty where the company's operating agreement provided that "no Indemnified Party shall owe any duty (including fiduciary duties) to the Company, the Member or any other Person" where such a waiver did "not eliminate liability of a Manager (i) for any breach of the Manager's duty of loyalty to the Company and the Member, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, or (iii) for any transaction from which the Manager derived an improper personal benefit[ ]").

266. Therefore, for purposes of resolving the present Motion, the Court finds that the Third-Party Complaint sufficiently alleges a claim for breach of fiduciary duty. *See Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 463 (Del. Ch. 2023) (concluding that the complaint sufficiently alleged facts that the exculpation provision of the company's operating agreement did not apply where "each defendant intentionally pursued a scheme to eliminate the [m]inority [u]nitholders at a grossly unfair price[ ]"); *Kelly v. Blum*, 2010 Del. Ch. LEXIS 31, at *57 (Del. Ch. Feb. 24, 2010) (denying a motion to dismiss because allegations that the defendants caused the company to "enter [into] a transaction that would benefit [defendants] at the expense of [plaintiff]" were sufficient to demonstrate willfulness such that the operating agreement's exculpation provision did not apply).

267. Therefore, Third-Party Defendants' Motion to Dismiss Abell and Magee's individual third-party claim for breach of fiduciary duty (as it relates to Highlights) is **DENIED**.

### (b) Empyrean

268. With respect to Abell's individual claim for breach of fiduciary duty against Third-Party Defendants based on their ownership and management of Empyrean, Empyrean's Operating Agreement contains no express limitation on the fiduciary duties that may be owed by the company's members and managers. (*See generally* Am. Compl. Ex. D.)

269. Instead, Third-Party Defendants assert that the language of *Highlights's* Operating Agreement effectively waives any fiduciary duties owed by the members or managers of Empyrean. This argument is based on the premise that either a subsidiary or an affiliate relationship exists between Highlights and Empyrean and relies on the following language from Section 5.5(c) of Highlights's Operating Agreement: "[T]he LLC and each Unitholder hereby waives any claim or cause of action against each Manager and each Unitholder . . . *and their respective Affiliates*, employees, agents and representatives for any breach of any fiduciary duty to the LLC or its Unitholders *or any of the LLC's Subsidiaries*[.]" (Am. Compl. Ex. A, at 39 (emphasis added).)

270. Because the Third-Party Complaint does not expressly allege that Empyrean is a "subsidiary" of Highlights or that Empyrean is an "affiliate" under the terms of Highlights's Operating Agreement, the Court believes that it would be better served by a more developed factual record in addressing this argument.

271. The Court notes that Third-Party Defendants have not cited—and the Court's independent research has been unable to locate—any case wherein a

Delaware court has found that the operating agreement of one limited liability company was capable of effectively eliminating or modifying potential liability for a breach of fiduciary duty relating to a separate company.

272. Therefore, Third-Party Defendants' Motion to Dismiss Abell's individual claim for breach of fiduciary duty against Graham, predicated on his ownership and control of Empyrean, is **DENIED**.

273. However, to the extent Abell has also attempted to assert a claim for breach of fiduciary duty against Knox Hill on this basis, as noted above, the Third-Party Complaint does not allege that Knox Hill is either a member or manager of Empyrean. Rather, the Third-Party Complaint alleges that Abell and Graham are the sole members of Empyrean and that Graham currently acts as its sole manager.

274. As such, there is no basis for the Court to conclude that Knox Hill owed any fiduciary duties to Abell as it relates to Empyrean.

275. Because a claim for breach of fiduciary duty cannot survive a motion to dismiss pursuant to Rule 12(b)(6) absent an allegation of the existence of a fiduciary relationship, the Court concludes that Third-Party Defendants' Motion to Dismiss should be **GRANTED**, and Abell's individual claim for breach of fiduciary duty against Knox Hill as it relates to the management of Empyrean is **DISMISSED** with prejudice.

### (c) HLRE

276. With respect to Abell and Magee's direct claim for breach of fiduciary duty against Third-Party Defendants based on their ownership and management of

HLRE, Section 5.5(c) and Section 7.1 of HLRE's Operating Agreement are substantively identical to the above-quoted portions of Highlights's Operating Agreement. (*Compare* Am. Compl. Ex. A, at 39 *with* Am. Compl. Ex. D, at 39.)

277. Under North Carolina law, "because an LLC is primarily a creature of contract, members of an LLC are usually free to arrange their relationship within the LLC by agreement as they wish." *Cranford*, 2026 NCBC LEXIS 88, at *51 (cleaned up). As a result, "they may depart from statutory default rules, require supermajority votes for some or all company matters, and impose or eliminate fiduciary duties for members and managers." *Vanguard Pai Lung, LLC*, 2019 NCBC LEXIS 39, *17–18 (cleaned up).

278. For the reasons stated above with respect to Abell and Magee's individual claim for breach of fiduciary duty in connection with Third-Party Defendants' ownership and management of Highlights, the Court concludes that it would be premature to dismiss Abell and Magee's claim as it relates to HLRE.

279. Therefore, Third-Party Defendants' Motion to Dismiss Abell and Magee's individual claim for breach of fiduciary duty against Graham based on his ownership and control of HLRE is **DENIED**.

280. However, to the extent Abell and Magee have also attempted to assert a claim for breach of fiduciary duty against Knox Hill on this basis, as noted above, the Third-Party Complaint does not allege that Knox Hill is either a member or manager of HLRE. Rather, the Third-Party Complaint alleges Abell, Magee, and Graham are the only members of HLRE and that Graham currently acts as its sole manager.

281. As such, there is no basis for the Court to conclude that Knox Hill owed any fiduciary duties to Abell and Magee as it relates to HLRE.

282. Therefore, the Court concludes that Third-Party Defendants' Motion to Dismiss should be **GRANTED**, and Abell and Magee's individual claim for breach of fiduciary duty against Knox Hill, as it relates to the ownership and management of HLRE, is **DISMISSED** with prejudice.

**(2)  Constructive Fraud**

283. As it relates to Abell and Magee's individual claim for constructive fraud against Third-Party Defendants based on their ownership and management of Highlights and Empyrean, Delaware law (as discussed above) does not recognize a claim for constructive fraud as an "independent, standalone tort" predicated on a party's breach of fiduciary duties. *See, e.g., Carsanaro*, 65 A.3d at 643.

284. Accordingly, Third-Party Defendants' Motion to Dismiss is **GRANTED**, and Abell and Magee's individual claim for constructive fraud is **DISMISSED** with prejudice as it relates to Third-Party Defendants' ownership and management of Highlights and Empyrean.

285. As for Abell and Magee's individual claim for constructive fraud against Graham based on his ownership and management of HLRE, Abell and Magee have sufficiently alleged that Graham's purported usurpation of Abell and Magee's respective ownership interests in HRLE was for his personal benefit. *See, e.g., Spivey v. Smith*, 2023 NCBC LEXIS 111, at *30 (N.C. Super. Ct. Sept. 18, 2023) (concluding that the complaint stated a valid claim for constructive fraud where the defendant

allegedly "seized control of the business and used that control for his personal advantage and profit[ ]").

286. Therefore, Third-Party Defendants' Motion to Dismiss Abell and Magee's individual claim for constructive fraud against Graham, as it relates to his ownership and management of HLRE, is **DENIED**.

287. However, because Knox Hill owed no fiduciary duties to Abell and Magee and was neither a member nor a manager of HLRE, Third-Party Defendants' Motion to Dismiss is **GRANTED**, and Abell and Magee's individual claim against Knox Hill for constructive fraud in connection with HLRE is **DISMISSED** with prejudice.

## B. Derivative Claims

288. In addition to asserting individual claims, Abell and Magee have also asserted derivative claims against Graham and Knox Hill on behalf of Highlights and Empyrean for (1) breach of fiduciary duty; and (2) corporate waste/self-dealing.

289. The parties agree that each of the derivative claims asserted in the Third-Party Complaint are governed by Delaware law. (Hearing Tr., at 163; *see also* N.C.G.S. § 57D-8-06 ("In any derivative proceeding in the right of a foreign LLC, the matters covered by this Article will be governed by the law of the jurisdiction of the foreign LLC's organization[.]").)

290. As an initial matter, the Court notes that, because Magee is not alleged to have been a member of Empyrean, he lacks standing to assert derivative claims on Empyrean's behalf. *See Clifford Paper, Inc. v. WPP Invs., LLC*, 2021 Del. Ch. LEXIS

109, at \*15–16 (Del. Ch. June 1, 2021) (concluding that a non-member of the limited liability company lacked standing to assert a derivative claim on the company's behalf); *see also* Del. Code Ann. tit. 6, § 18-1002 (stating that "[i]n a derivative action, the plaintiff must be a member or an assignee of a limited liability company interest at the time of bringing the action").

291. Accordingly, to the extent that Magee has attempted to assert derivative claims of breach of fiduciary duty and corporate waste/self-dealing on Empyrean's behalf, those claims are **DISMISSED** without prejudice.

292. The Court will next address Third-Party Defendants' substantive challenges to the third-party derivative claims.

293. In connection with the third-party derivative claims for breach of fiduciary duty and corporate waste/self-dealing, Graham and Knox Hill contend that the Third-Party Complaint fails to state a claim because: (1) Section 5.5(c) of Highlights's Operating Agreement eliminates any fiduciary duties owed to Highlights or Empyrean; (2) Graham and Knox Hill's management decisions are protected by the business judgment rule; and (3) the Third-Party Complaint fails to allege the challenged transactions with sufficient particularity.

294. First, as discussed above, the Court believes that it would benefit from a more fully developed record on the issue of whether, and to what extent, Highlights's Operating Agreement eliminates any fiduciary duty owed by Graham and Knox Hill to the Companies.

295. Second, it is well recognized under Delaware law that the business judgment rule does not apply to claims supported by allegations of self-dealing or bad faith. *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 52 (Del. 2006) (holding that the presumption afforded by the business judgment rule "can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith[ ]").

296. In the Third-Party Complaint, Abell and Magee have alleged that Graham—individually and through Knox Hill—engaged in various self-interested transactions, including causing Highlights and Empyrean to pay for (1) an apartment in downtown Charlotte, North Carolina, for his personal use; (2) a private jet for his personal use; and (3) other personal expenses, including vacations, vehicles, meals, home repairs, remodeling costs, and mortgage payments. (Third-Party Compl. ¶ 15.) Such allegations are sufficient at this stage of the litigation to overcome Graham and Knox Hill's invocation of the business judgment rule.

297. Third, claims of this type are not held to a heightened pleading standard. *See, e.g.*, *McCarron*, 2024 NCBC LEXIS 144, at *7 ("[C]laims for breach of fiduciary duty are not held to a heightened pleading standard and instead must only comply with North Carolina's liberal notice pleading standard."); *see also Feltman v. City of Wilson*, 238 N.C. App. 246, 252 (2014) (noting that "[u]nder notice pleading, a statement of [a] claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought[ ]").

298. Upon careful review, the Court is satisfied that the allegations in the Third-Party Complaint are sufficient to meet the low bar of notice pleading applicable to claims for breach of fiduciary duty, corporate waste, and self-dealing. *See PT China LLC v. PT Korea LLC*, 2010 Del. Ch. LEXIS 38, at *31 (Del. Ch. Feb. 26, 2010) (denying a motion to dismiss and concluding that allegations that the defendant used the company's property "for his personal self-interest[ ] . . . would be a classic example of self-dealing and another breach of the duty of loyalty[ ]").

299. Finally, although the claims for breach of fiduciary duty and corporate waste/self-dealing asserted derivatively on behalf of Empyrean have been brought against both Graham and Knox Hill, as noted above, the Third-Party Complaint does not allege that Knox Hill has ever been a member or manager of Empyrean.

300. Accordingly, to the extent that Abell has attempted to assert derivative claims of breach of fiduciary duty and corporate waste/self-dealing on Empyrean's behalf against Knox Hill, those claims are **DISMISSED** with prejudice.

C. **Piercing the Corporate Veil**

301. North Carolina law and Delaware law are substantively identical as it relates to a party's entitlement to pierce the corporate veil. *See Harris v. Ten Oaks Mgmt., LLC*, 2022 NCBC LEXIS 62, at *5 (N.C. Super. Ct. June 20, 2022) (concluding that there was "no need to decide the choice-of-law issue" as it relates to veil-piercing because "neither side has suggested that Delaware's veil-piercing law differs from North Carolina's in any relevant way"); *see also Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch.. 1992) (noting that "a court can pierce the corporate veil of an

entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner[ ]").

302. Third-Party Defendants' sole argument for rejection of Abell and Magee's piercing the corporate veil theory is predicated on their request that the Court dismiss each of the third-party claims for monetary relief.

303. However, because the Court has concluded that the Third-Party Complaint has sufficiently pled at least *some* claims for monetary relief against Graham and Knox Hill, Third-Party Defendants' Motion to Dismiss on this issue is **DENIED**.

## CONCLUSION

**THEREFORE**, **IT IS ORDERED** as follows:

1. Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part** as follows:

    a. The Companies' claim for Specific Performance is **DISMISSED without prejudice** to the Companies' right to pursue specific performance as an equitable remedy at a later stage of the litigation;

    b. Highlights and Empyrean's claim for constructive fraud is **DISMISSED with prejudice**;

    c. Empyrean and HLRE's claim for breach of contract is **DISMISSED with prejudice**;

d. Highlights's claim for breach of the non-competition provision of the Restrictive Covenants is **DISMISSED with prejudice**;

e. Highlights and HLRE's claim for misappropriation of trade secrets is **DISMISSED with prejudice**;

f. Empyrean's claim for misappropriation of trade secrets against Magee, O'Reilly, Stanley, and Cher Abell is **DISMISSED with prejudice**;

g. Highlights and HLRE's claim for conspiracy and aiding and abetting misappropriation of trade secrets is **DISMISSED with prejudice**;

h. Empyrean's claim for conspiracy and aiding and abetting misappropriation of trade secrets against Cher Abell is **DISMISSED with prejudice**;

i. The Companies' claim for tortious interference with business relationships against O'Reilly and Stanley is **DISMISSED without prejudice**;

j. The Companies' claim for tortious interference with business relationships against Cher Abell is **DISMISSED with prejudice**;

k. The Companies' claim for UDTP against Cher Abell is **DISMISSED with prejudice**;

l. The Companies' claim for forgery/fraudulent inducement is **DISMISSED with prejudice**;

m. In all other respects, Defendants' Motion to Dismiss is **DENIED**.

2. The Companies' Motion to Dismiss is **GRANTED in part** and **DENIED in part** as follows:

a. Abell and Magee's counterclaim for breach of the implied covenant of good faith and fair dealing against Highlights and Empyrean is **DISMISSED with prejudice**;

b. Abell and Magee's counterclaim for UDTP is **DISMISSED with prejudice**;

c. In all other respects, the Companies' Motion to Dismiss is **DENIED**.

3. Third-Party Defendants' Motion to Dismiss is **GRANTED in part** and **DENIED in part** as follows:

a. Abell's individual claim for breach of fiduciary duty against Knox Hill, as it relates to Empyrean, is **DISMISSED with prejudice**;

b. Abell and Magee's individual claim for breach of fiduciary duty against Knox Hill, as it relates to HLRE, is **DISMISSED with prejudice**;

c. Abell and Magee's individual claim for constructive fraud against Graham, as it relates to Highlights and Empyrean, is **DISMISSED with prejudice**;

d.   Abell and Magee's individual claim for constructive fraud against Knox Hill is **DISMISSED with prejudice**;

e.   Magee's derivative claim, asserted on behalf of Empyrean, for breach of fiduciary duty is **DISMISSED without prejudice**;

f.   Magee's derivative claim, asserted on behalf of Empyrean, for corporate waste/self-dealing is **DISMISSED without prejudice**;

g.   Abell's derivative claim, asserted on behalf of Empyrean, for breach of fiduciary duty against Knox Hill is **DISMISSED with prejudice**;

h.   Abell's derivative claim, asserted on behalf of Empyrean, for corporate waste/self-dealing against Knox Hill is **DISMISSED with prejudice**;

i.   In all other respects, the Third-Party Defendants' Motion to Dismiss is **DENIED**.

**SO ORDERED**, this the 23rd day of July 2026.[15]

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases

---

[15] As the Court has now dismissed all claims against Cher Abell, her name should be removed from the case caption in all future filings in this case.